[No. B226685. Second Dist., Div. Four. Jan. 23, 2012.]

RICHARD JOAQUIN, Plaintiff and Respondent, v.
CITY OF LOS ANGELES, Defendant and Appellant.

**COUNSEL**

Carmen A. Trutanich, City Attorney, and Paul L. Winnemore, Deputy City Attorney, for Defendant and Appellant.

Lipow & Harris, Jeffrey Lipow, Sean P. Feeney; Benedon & Serlin, Douglas G. Benedon and Kelly R. Horwitz for Plaintiff and Respondent.

**OPINION**

**SUZUKAWA, J.—**

### INTRODUCTION

This case has a somewhat tortuous procedural history. Plaintiff Richard Joaquin, a Los Angeles Police Department officer, complained of sexual

harassment by Sergeant James Sands in 2005. The department investigated and found Joaquin's complaint unfounded. Sands then pursued a complaint against Joaquin for filing a spurious sexual harassment charge. Internal affairs investigated Sands's complaint, agreed that Joaquin's charge was without foundation, and recommended that the matter be adjudicated by a board of rights. The board of rights found Joaquin's charge to have been fabricated and recommended termination. The chief of police adopted the recommendation, and Joaquin was terminated effective March 2006.

Joaquin filed a petition for writ of mandate. The superior court granted the petition and ordered Joaquin reinstated, concluding that the board of rights's findings were not supported by the weight of the evidence.

Following his reinstatement, Joaquin filed the present action against the City of Los Angeles (City),[1] alleging that his termination was in retaliation for filing a sexual harassment complaint in violation of the California Fair Employment and Housing Act (FEHA). (Gov. Code, § 12940 et seq.) A jury agreed and awarded Joaquin more than $2 million for lost wages and emotional distress.

The City appeals, contending, among other things, that the jury's verdict was not supported by substantial evidence. Having reviewed the entire record, we agree that Joaquin did not present substantial evidence that his termination was motivated by retaliatory animus, a necessary element of his claim. We thus reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Joaquin's Sexual Harassment Complaint Against Sands*

Joaquin is a police officer employed by the Los Angeles Police Department (LAPD or department). From 1999 until 2006, he was a motor officer assigned to the central traffic division (CTD).

Sands is an LAPD sergeant who was assigned to the CTD as a collision investigation supervisor in 2001 or 2002. He occasionally served as CTD watch commander and in this capacity had supervisory authority over Joaquin.

On January 7, 2005, Joaquin was on duty and Sands was the watch commander. About 4:30 that afternoon, Joaquin told Sands he was leaving because his shift was over. Sands said that the shift had not yet ended and

---

[1] Joaquin dismissed two individual defendants prior to trial.

ordered Joaquin to return. Whether Joaquin returned to the station is disputed by the parties: Sands contended that Joaquin did not return; Joaquin contended that he returned to the station, went to use the restroom, and then left for home when he saw other motor officers leaving because he believed his shift had been dismissed.

That evening, Joaquin received a phone call from a coworker who said he had heard that there had been an incident between Joaquin and Sands at the end of the shift. Joaquin testified that he perceived Sands's response to be in retaliation for Joaquin having rebuffed a prior sexual advance by Sands (discussed in greater detail below) and was part of a pattern of conduct in which Sands "was sexually harassing me, . . . stalking me, . . . exercising his power." He feared that Sands "was going to start escalating the situation even more and start getting back at me even more, and it was going to get worse and worse."

That evening, Joaquin called an 800 number and anonymously reported that he was being sexually harassed. The person to whom Joaquin spoke said he could take a complaint or Joaquin could speak directly to his supervisor. Joaquin chose not to make a complaint at that time. The following day, Joaquin spoke about the end of watch incident to Lieutenant Corso. Corso said he wanted to talk with both Joaquin and Sands to determine what actually happened.

On January 14, 2005, Sands was again the watch commander. He called Joaquin into his office and said he was going to serve him with a negative "comment card," a notation in Joaquin's personnel file that he had been counseled regarding an improper action. Sands asked Joaquin what he believed had happened, and Joaquin told him that Lieutenant Corso wanted to discuss the incident with them. Sands then took the comment card back and did not officially serve Joaquin with it.

That evening, Joaquin called Sergeant Ruby Malachi, a supervisor at CTD with whom Joaquin had a friendly relationship. Joaquin told Malachi that Sands had asked him out on a date and then had retaliated against him and sexually harassed him because he had declined Sands's advances. Malachi said she would report the allegations to her immediate supervisor, Captain Ann Young. However, because Joaquin was concerned about confidentiality, she told him she would not share the allegations with anyone else. Malachi reported Joaquin's allegations to Captain Young that same evening.

The next day, Captain Young called Joaquin and told him that she had learned of his report of sexual harassment from Sergeant Malachi and was going to talk to her supervisor about it. She then turned the complaint over to

internal affairs, which assumed responsibility for investigating it. A few days later, Joaquin was told to report to internal affairs for an interview regarding the incident.

About the same time, Captain Young met with Sands to advise him that he was being investigated for sexually harassing Joaquin and would be transferred to another department until the investigation was complete. According to Young, Sands "was stunned, completely devastated, kept saying over and over, I didn't do anything. He was very tearful, crying at times."

During his interview with internal affairs, Joaquin reported that Sands had engaged in the following acts of misconduct:

October 23, 2003: Sands ordered Joaquin to drive with him to an LAPD shooting range to "qualify" his service weapon (i.e., to demonstrate proficiency with his firearm). During the drive, Sands asked Joaquin personal questions, such as whether he had kids and if he was dating anyone. Then, he asked whether Joaquin would "like to go out some time." Joaquin said he is not gay and dates only women. Sands asked him not to tell anyone he is gay.

February or March 2004: Joaquin was working out at the gym at central facilities. Sands walked into the gym, approached Joaquin, and said, "You have nice arms."

Summer 2004: Joaquin was on "desk duty" at CTD. Sands called several times and made smalltalk with Joaquin. The third time Sands called, Joaquin asked if he wanted to talk to the watch commander and offered to give Sands the inside line. Sands responded, "What if I want to talk to you?"

Summer 2004: Joaquin and other officers were watching women's basketball on television. Sands changed the channel to the Olympic men's diving competition and said, "They look good."

Late 2004: "Code 6" is a term that motor officers use to inform dispatch that they have made a traffic stop and to identify their location in the field. Sands showed up at several of Joaquin's Code 6 locations, parked 50 to 100 feet away, watched Joaquin, and then drove away without speaking to him. As a result of these incidents, Joaquin stopped broadcasting his Code 6 locations to dispatch.

Unknown date: On his day off, Sands showed up in his own vehicle at Joaquin's Code 6 location and said, "You look nice standing there." Joaquin later found out that Sands lived nearby.

December 2004: Sands showed up at a CTD basketball game, where Joaquin regularly played. After the game, Sands approached Joaquin at the water cooler and asked whether he was going to take a shower.

Internal affairs investigated Joaquin's allegations against Sands and determined they were unfounded.

## II.  *Sands's Complaint Against Joaquin*

Sands learned the details of Joaquin's allegations against him when internal affairs completed its investigation and gave Sands a copy of its file to review. Sands then made an official complaint against Joaquin. The complaint was turned over to internal affairs, which charged Joaquin with two counts of misconduct: (1) retaliating against Sands by filing a false complaint and (2) while on duty, providing false statements during an official investigation.

While the investigation was pending, Joaquin was sent to supervisor's school in preparation for an anticipated promotion to sergeant.

Detective Hector Sanchez and Lieutenant Mario Munoz, both with internal affairs, investigated Sands's complaint. In the course of their investigation, Sanchez and Munoz interviewed approximately 13 officers of various ranks. They turned the results of their investigation over to Captain Young, who recommended that the allegations against Joaquin be sustained. Further, due to the serious nature of the allegations, Captain Young recommended that the matter proceed to a board of rights hearing, a formal adjudication by two sworn officers and one civilian in which the accused officer has the right to be represented by counsel and to call witnesses. As a result of the commencement of the board of rights proceeding, Joaquin's promotion to sergeant was put on hold and he was temporarily relieved of duty.

The department was represented at the board of rights hearing by Sergeant William Sera of internal affairs and Joaquin was represented by an attorney. The hearing lasted about seven days. On March 13, 2007, the board of rights found that Joaquin was guilty of count 1 (retaliation by filing a false complaint), but was not guilty of count 2 (providing misleading statements during an official complaint investigation).[2] In its "Rationale on Findings," the board of rights stated as follows:

---

[2] The Board explained as follows: "Detective Sanchez testified that you would need to consider the totality of all the statements to determine if Officer Joaquin provided misleading statements during an official complaint investigation. The Board found that there were inconsistencies in the testimony and in the tape-recorded interviews that could be attributed to both the department's case and the defense case. [¶] The Department Manual, volume III, section 828 states that an employee who becomes aware that a statement has been misunderstood or misrepresented has an obligation to correct the misunderstanding or misrepresentation.

"For the record, the Board deliberated extensively on count 1 as it realized that the credibility of witnesses and the sequence of events would be critical to the adjudication of this court.

"In the Board's deliberation of count 1, we gave Officer Joaquin the benefit of every doubt in reviewing testimony in evidence presented before the Board. This was done to be completely fair and impartial in view of the complexity of this case.

"The Board considered every separate incident of alleged sexual harassment expressed by Officer Joaquin. This included . . . the claim that Sergeant Sands asked Officer Joaquin for a date, the numerous phone calls to the front desk, the references in the gym about Officer Joaquin's arms, the Code 6 supervisory follow-ups, and the alleged comments associated around the basketball team.

"The Board began its deliberations by creating a timeline and reviewing all the circumstances associated with this count. There were several factors that led the Board to their findings.

"First, the Board unanimously believed that Sergeant Sands' testimony was credible. It appeared that his speech, body language, demeanor were consistent with being a victim of retaliation.

"The Board had doubts as [to] the plausibility of Officer Joaquin's version of what occurred. It was our belief, based upon the evidence and testimony presented[,] that if Officer Joaquin . . . was truly sexually harassed that he would have reported this early on to the department. We heard many witnesses testify to Officer Joaquin's personality. He was described as assertive, aggressive, a peer leader. He certainly was not portrayed as being meek or someone that would allow[] himself to be victimized in the manner that he described. We find it hard to believe that his assertion of his embarrassment over the incident would keep him from bringing it to the department's attention. Even though we recognize he has the right to silence.

"The Board believed that one true motive for Officer Joaquin's action was the fact that he received a phone call from Officer McDonald and was told that he was potentially in trouble and possible the subject of 'paperwork' (which could be construed as future administrative discipline). It was at this

It was the Board's opinion that the department should have given Officer Joaquin ample opportunity to clarify any misstatements that the department became aware [of] after reviewing both interviews. Testimony given by Detective Sanchez was not conclusive that this occurred. Therefore, the Board by unanimous opinion found Officer Joaquin not guilty."

point that the Board believed he made a conscious decision to potentially use the department's discipline system to relieve him from his own inaction. . . .

"His next action supports this when he called the IAG duty room anonymously, asking for advice on how to initiate a sexual harassment complaint against a supervisor.

"It is clear from the testimony and the evidence presented that Sergeant Sands wrote a comment card referencing his belief that Officer Joaquin on January 7th, 2005, failed to check out with the watch commander before going end of watch. . . .

"The Board believes that this incident was the driving force in Officer Joaquin initiating the personnel complaint against Sands. It is clear that he believed he was going to be the subject of disciplinary action that could have negatively impacted his future promotion to sergeant, and made the above referenced poor decision to seek disciplinary [action] against Sergeant Sands.

"Throughout these proceedings, the defense continued to reference the fact that Officer Joaquin never initiated the actual complaint against Sergeant Sands. They contend that Officer Joaquin notified Sergeant Mal[a]chi who then informed Captain Ann Young as to the nature of the complaint. It is the Board's belief that Officer Joaquin clearly understood the complaint system and by reporting his allegations to his supervisor it would trigger a complaint against Sergeant Sands.

"As previously stated, the Board spent considerable time deliberating the adjudication of count I. Based upon the preponderance of the evidence, the Board finds Officer Joaquin guilty and concludes that he retaliated against Sergeant Sands by initiating a false complaint."

The board of rights subsequently issued a "Rationale on Penalty" on March 15, 2007, which stated in pertinent part as follows:

"[I]n finding you guilty of count I, this Board has found that you have failed to meet minimum standards required of a member of the Los Angeles Police Department, and you have violated the intent of Department Manual section 1/210.20, which discusses integrity. . . . [B]y initiating a false personnel complaint against your direct supervisor, you have certainly violated the integrity section mentioned above. Your actions also negatively impacted Sergeant Sands' professional and personal life. He was removed from C.T.D. His character was impugned. He had to suffer false rumors and innuendos regarding his sexuality, which led to physical and emotional distress. [¶] . . . [¶]

"Officer Joaquin, this is the most difficult decision that members of this Board have ever made in a disciplinary matter. The case before us was very complex and required much concentration and deliberations before the Board members felt comfortable with the decision.

"Officer Joaquin, it is clear that throughout your career you have demonstrated an outstanding work ethic and professional demeanor . . . . However, after considering all the evidence presented in this case, the Board feels that retaining your position as a Los Angeles police officer would send a conflicting message about the values and expectations we demand of all of our officers. Therefore, the Board recommends to the Chief of Police that you be removed from office and terminated as a member of the Los Angeles Police Department."

The chief of police adopted the board's recommendations, and Joaquin was terminated effective April 22, 2006.

III. *Writ Proceeding and Joaquin's Reinstatement*

Joaquin sought writ review of the board of rights's decision. On September 23, 2008, the superior court concluded that the board of rights's findings were not supported by the weight of the evidence and ordered Joaquin reinstated.[3]

---

[3] The superior court's findings in the writ proceeding were not before the jury, but are part of the appellate record. They are as follows:

"[A] Board of Rights hearing . . . is a *de novo* evidentiary hearing. Charter § 1070(f). The Board of Rights consists of two officers with the rank of captain or above and one civilian. Charter § 1070(h). The LAPD has the burden of proof by a preponderance of evidence. Charter § 1070(l). Upon a finding of guilt, the Board recommends discipline, ranging from reprimand to removal. Charter § 1070(n). The Chief of Police has discretion to impose a lesser penalty, but not a greater penalty, than recommended. Charter § 1070(p). The officer can ask the Chief of Police for a rehearing at any time within three years. Charter § 1070(t). [¶] . . . [¶]

"This case turns on the issue of witness credibility. The Board of Rights determined that Sands was a credible witness from his speech, body language, and demeanor. . . . All of this is entitled to a presumption of correctness.

"Nonetheless, the court must make an independent judgment of credibility and does not agree. While the court does not have the benefit of having been able to make these observations, the court can and has reviewed what the witnesses said. There are aspects of Sands' testimony that do not make sense or are inconsistent with what others stated, including relatively minor matters such as who played on the Central basketball team. On the other hand, Joaquin's account is clear, and precise, and is corroborated by other witnesses in certain respects (most notably the testimony about the basketball team).

"Moreover, the Board of Rights seemed to base its credibility decision not on facts or evidence, but on an argument. It stated that, given Joaquin's assertive and not meek personality, it was hard to believe his assertion of embarrassment over Sands' sexual harassment because he would have reported it early and not hidden it. . . .

As a result of the writ proceeding, Joaquin was reinstated in January 2009. He was transferred from CTD to the Valley Traffic Division, which was a lengthy drive from his home. The transfer was via administrative transfer, which Joaquin testified was a black mark on his record. Joaquin has not been promoted to sergeant and testified that he believes the department has continued to retaliate against him.

## IV. *The Present Action*

Joaquin filed the present action on December 18, 2006, and filed the operative first amended complaint on February 11, 2009. It alleges that Joaquin's termination was in retaliation for filing a sexual harassment complaint against Sands, and thus gave rise to a cause of action for retaliation in violation of FEHA.[4]

"The problem with this reasoning is that it is inconsistent with reality. Strong anti-gay feelings often are prevalent in organizations such as the Department . . . . Thus, a decision by Joaquin not to complain about Sands' conduct, lest he also suffer discrimination, is perfectly consistent with his aggressive personality. . . .

"The Board of Rights also seems to have based its decision on a conclusion that Joaquin was guilty of insubordination in the January 7, 2005 incident . . . . [¶] . . . [¶]

"In this case, it is not clear that Joaquin even knew he would be disciplined. Joaquin did not know that Sands had initiated a comment card against him when he reported Sands to Malachi on January 14, 2005.

"No doubt, Joaquin had reason to believe he might be disciplined, and this could be a motivating factor in his disclosure. However, more important than Joaquin's motivation is the truth. Joaquin had a lawful right to report sexual harassment, and terminating an employee for reporting what an employee reasonably believes to be sexual harassment is a tort. [Citation.] The uncontradicted evidence is that some or all of the events reported by Joaquin actually occurred. Joaquin provided a detailed and consistent account of conduct which made him feel uncomfortable or offended. In the face of these allegations, Sands did not completely deny the shooting range [fn. omitted] or weight room incidents, or calling the front desk. He had a different explanation for the field impound location and Olympics incidents, but again did not deny that they occurred. He was contradicted on the basketball game incident, for he contended he was a member of the team long before Joaquin when Joaquin started the team and had always been one of the two coaches. [Fn. omitted.]

"Plainly, there were events that occurred that made Joaquin feel uncomfortable. Some or even all of these events may have been innocent or trivial. But Joaquin had a legal right to report them, as well as his reaction to them. This is particularly true since Sands was Joaquin's direct supervisor and he believed that Sands may be retaliating against him for refusing his advances. That this report may have been motivated by a desire to avoid punishment for the January 2005 incident does not control.

"In sum, the Board of Rights' findings are simply not supported by the weight of the evidence. [Fn. omitted.] This does not mean that the court agrees with Joaquin's conclusion that Sands committed improper sexual advances and sexual harassment. That conclusion is not at issue; what is at issue is whether the events occurred as relayed by Joaquin or whether he made a false and spurious accusation. The Department did not carry its burden of proving before the Board of Rights that he did."

[4] Joaquin alleged two additional causes of action, for sexual harassment and failure to prevent retaliation, but abandoned them prior to trial.

The case was tried to a jury. On May 20, 2010, the jury returned a special verdict for Joaquin, as follows:

"1. Did Richard Joaquin report sexual harassment? [¶] Yes. . . .

"2. Did the City of Los Angeles terminate Richard Joaquin's employment or deny him promotion to the rank of sergeant? [¶] Yes. . . .

"3. Was Richard Joaquin's reporting sexual harassment a motivating reason for the City of Los Angeles terminating Richard Joaquin's employment or denying him promotion to the rank of sergeant? [¶] Yes. . . .

"4. Was the City of Los Angeles' conduct a substantial factor in causing harm to Richard Joaquin? [¶] Yes. . . .

"5. What are Richard Joaquin's damages?

"a. Past lost wages and benefits: $128,722

"b. Future lost wages and benefits: $706,040

"c. Post loss for mental and emotional suffering: $900,000

"d. Future loss for mental and emotional suffering: $400,000"

Judgment was entered on special verdict, and notice of entry of judgment was served on May 20, 2010. The City timely appealed from the judgment and posttrial motions.

## STANDARD OF REVIEW

"Actions for unlawful discrimination and retaliation are inherently fact-driven, and we recognize that it is the jury, and not the appellate court, that is charged with the obligation of determining the facts. Nonetheless, the jury's verdict stands only if it is supported by substantial evidence. 'In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court [or jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [factfinder's] decision. However, we may not defer to that decision entirely. "[I]f the word 'substantial' means anything at all, it clearly implies that such evidence must be of

ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." [Citations.]

" 'Although each case must be judged for sufficient evidence on its own peculiar circumstances, a number of general guidelines may be set forth. First, a judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.] And although an appellate court will normally defer to the trier of fact's drawing of inferences, it has been said: "To these well settled rules there is a common sense limited exception which is aimed at preventing the trier of the facts from running away with the case. This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities." [Citations.]' (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203–1204 [52 Cal.Rptr.2d 518].)" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389–390 [48 Cal.Rptr.3d 313] (*McRae*).)

## DISCUSSION

I. *Legal Framework*

■ FEHA declares it an "unlawful employment practice" for any employer "because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation of any person, . . . to discharge the person from employment . . . , or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).) The statute also prohibits employers from retaliating against employees for engaging in protected activity—i.e., for "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because the person has opposed any practices forbidden under this part . . . ." (*Id.*, § 12940, subd. (h).)

■ Courts have noted that proof of intentional discrimination or retaliation often depends on circumstantial evidence because it consists of "subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." (*Mamou v.*

*Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713 [81 Cal.Rptr.3d 406] (*Mamou*).) Given the resulting difficulties of proof, the courts have fashioned a special presumption shifting the burden of production—but not persuasion—to the employer upon a prescribed showing by the plaintiff. Specifically, "the employee 'may raise a presumption of discrimination by presenting a "prima facie case," the components of which vary with the nature of the claim, but typically require evidence that "(1) [the plaintiff] was a member of a protected class [or engaged in a protected activity], (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory [or retaliatory] motive. [Citations.]" (*Guz* [v. *Bechtel National, Inc.* (2000)] 24 Cal.4th [317,] 355 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff. (*Ibid.*)' " (*Mamou, supra,* at pp. 713–714.)

Such evidence, however, only satisfies the plaintiff's initial burden. " 'Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation " ' "drops out of the picture," ' " and the burden shifts back to the employee to prove intentional retaliation. [Citation.]' (*Yanowitz* [v. *L'Oreal USA, Inc.* (2005)] 36 Cal.4th [1028,] 1042 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)" (*McRae, supra,* 142 Cal.App.4th at p. 388.)

■    In the present case, Joaquin indisputably established a prima facie case of retaliation—the evidence was undisputed that he engaged in protected activity (reporting sexual harassment), was performing competently as a motor officer, and suffered an adverse employment action (termination). Further, the department articulated a legitimate, nonretaliatory reason for the adverse employment action, i.e., that Joaquin fabricated a sexual harassment complaint against Sands. Thus, the presumption of retaliation " ' " ' "drop[ped] out of the picture" ' " ' " and the burden shifted back to Joaquin to prove a FEHA violation by establishing each of the elements of intentional retaliation: "(1) the employee's engagement in a protected activity, i.e., 'oppos[ing] any practices forbidden under this part'; (2) retaliatory animus on the part of the employer; (3) an adverse action by the employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation." (*Mamou, supra,* 165 Cal.App.4th at p. 713.)

## II. *Retaliatory Intent*

The City contends that Joaquin failed to introduce substantial evidence of the second element of a cause of action for violation of FEHA—that its decision to terminate Joaquin was motivated by retaliatory animus/intent. For the following reasons, we agree.

### A. *Governing Law*

Although the parties agree that retaliatory intent is an element of a FEHA retaliation claim, they disagree as to what Joaquin was required to prove with regard to this element and whether he satisfied his burden of proof. The City urges that Joaquin had to prove that those involved in the decision to terminate him harbored unlawful retaliatory animus. The City further contends that Joaquin failed to make the necessary showing because there was no substantial evidence of animus by the board of rights. Joaquin disagrees, contending that he was required to prove only a causal link between his harassment complaint and termination. Further, he says, the board of rights conceded the necessary causal link in its statement of decision. According to Joaquin: "[R]arely is the causal connection between a plaintiff's protected conduct and a defendant's retaliation as clear-cut as in this case. Usually in order to establish the causal link, a fact-finder must resort to 'inference derived from circumstantial evidence, such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision. [Citations.]' [Citations.] No reliance on inference was required here. Instead, the City memorialized its improper reasoning in the charges it filed against Joaquin. [Citation to record.] The Board of Rights then recommended Joaquin's termination on grounds that he had filed a false complaint against Sands. [Fn. omitted; citation to record.] The filing of that complaint, however, was protected conduct. [Citations.]"

Joaquin is correct that there was a direct causal connection between his report of sexual harassment and the board of rights's recommendation to terminate him. However, the board of rights did not recommend termination merely because Joaquin had reported sexual harassment, but rather because it concluded that he had fabricated the accounts of sexual harassment. In other words, the board of rights recommended termination not because Joaquin had reported sexual harassment, but because it concluded that he had done so *falsely*.

On this unusual set of facts, the relevant legal question is whether an employee may be disciplined if his or her employer concludes that the employee has fabricated a claim of sexual harassment, or whether such a

complaint is insulated from discipline even where, as here, the employer determines that it was fabricated. Neither Joaquin nor the City has cited any case addressing this issue, and we are not aware of any California case that has discussed it. Our research has revealed, however, that the question whether a false report of discrimination or harassment may lawfully be a basis for discipline has been addressed in federal cases interpreting title VII of the Civil Rights Act of 1964 (42 U.S.C.S. § 2000e et seq.) and state antidiscrimination laws. These cases are persuasive in determining the meaning of analogous provisions of FEHA (e.g., *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 498 [59 Cal.Rptr.2d 20, 926 P.2d 1114]), and thus we now consider them.

*Richey v. City of Independence* (8th Cir. 2008) 540 F.3d 779 (*Richey*) is one such case. There, the plaintiff was employed by the city as a park ranger. The plaintiff's coworker, Knott, complained to her supervisor that the plaintiff had become angry with her over matters relating to park policy and she felt threatened by his temper. About the same time, the plaintiff contacted human resources and complained that Knott had inquired whether he had a girlfriend and had engaged in affectionate contact such as hugging and placing her head in his lap. The plaintiff also complained that Knott had made inappropriate comments of a sexual nature to him and had shown up unannounced at his house on a Sunday morning to take him to church. (*Id.* at p. 781.)

Human resources conducted an investigation into the plaintiff's allegations about Knott and determined they were unsupported. On the basis of that determination and a city policy against knowingly filing a false grievance, the plaintiff's supervisor recommended that the plaintiff be terminated. The plaintiff requested and was granted a hearing before a personnel board made up of five citizens who were not city employees. The board found that the plaintiff knowingly made false complaints against Knott and, on the basis of that finding, the plaintiff was terminated. (*Richey, supra*, 540 F.3d at p. 782.)

The plaintiff sued the city, alleging unlawful retaliation in violation of the Missouri Human Rights Act (MHRA). (*Richey, supra*, 540 F.3d at p. 782.) The trial court granted summary judgment for the city, and the Eighth Circuit affirmed. It explained that retaliation claims for which there is no direct evidence of retaliation typically are analyzed under the framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 [36 L.Ed.2d 668, 93 S.Ct. 1817]. Under that approach, if a plaintiff makes a prima facie case of unlawful retaliation, the employer must then articulate a legitimate, nondiscriminatory reason for the employment action. If the employer does so, the plaintiff has the burden of persuasion to show that the employer's proffered reason is a pretext for unlawful discrimination. (*Richey, supra*, 540 F.3d at p. 784.) In *Richey*, the employer's proffered reason was

that the plaintiff violated personnel policies of the city. That violation was a valid basis for termination, even though the subject of the violation was a sexual harassment report. The court explained: "An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action. [Citation.] The normal rule in discrimination cases is that if an employer honestly believes that an employee is terminated for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be liable for discrimination. [Citation.] If the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity. 'The relevant inquiry is whether the [employer] *believed* [the employee] was guilty of the conduct justifying discharge.' [Citation.] Therefore, a plaintiff seeking to avoid summary judgment under the *McDonnell Douglas* framework must demonstrate more than a genuine issue of material fact as to whether the employee violated workplace rules. He must show a genuine issue of fact about whether the employer acted based on an intent to retaliate rather than on a good faith belief that the employee violated a workplace rule." (*Richey, supra*, 540 F.3d at p. 784.)

In the case before it, the court said, the city legitimately relied on the personnel board's conclusion that the plaintiff's report of harassment was false. Further, the plaintiff presented no evidence that the city inconsistently applied its termination policy or that any person situated similarly to the plaintiff was not disciplined for violating the policy. (*Richey, supra*, 540 F.3d at p. 786.) Thus, the court concluded, the district court's grant of summary judgment was proper. (*Ibid.*)

The court reached a similar result in *E.E.O.C. v. Total System Services, Inc.* (11th Cir. 2000) 221 F.3d 1171 (*Total System*). There, an employee complained that a supervisor, Wimberly, had sexually harassed female employees. Eight women were interviewed and many confirmed that Wimberly had engaged in sexually harassing conduct. Wimberly was fired. During the investigation, the plaintiff said that on one occasion Wimberly had unzipped his pants and made an inappropriate sexual comment. The plaintiff said that two female coworkers were present during the incident, but although those coworkers confirmed some of Wimberly's harassing conduct, both denied witnessing the zipper incident. That allegation was the only story about Wimberly that the investigators were unable to corroborate. The employer believed that the plaintiff had not told the truth about that incident, and the plaintiff was fired for lying during an investigation. (*Id.* at p. 1173.)

The plaintiff complained about her termination to the Equal Employment Opportunity Commission (EEOC) and the EEOC filed suit, alleging that the plaintiff had been terminated in retaliation for complaining about supervisor sexual harassment. The district court granted the employer's motion for summary judgment, and the Eleventh Circuit affirmed. (*Total System, supra*, 221 F.3d at pp. 1173–1174.) It explained: "The EEOC says that an employee's speech in opposition [to harassing conduct] is protected—that is, cannot be the basis for negative employment acts—unless the employee actually lied. [Fn. omitted.] According to the EEOC, that the employer has a good faith belief that the employee lied is insufficient to justify adverse employment action. Thus, the EEOC contends that summary judgment cannot be granted for the employer if a disputed issue of material fact exists on the question of whether the employee had actually lied. The EEOC argues that an employer must bear the risk of Title VII liability if the employer fires an employee who did not actually lie even when the employer had good reason to believe the employee had lied. We cannot agree. [¶] . . . [¶]

". . . As in this case, whether to fire an employee for lying to the employer in the course of the business's conduct of an important internal investigation is basically a business decision; this decision, as with most business decisions, is not for the courts to second-guess as a kind of super-personnel department. [Citation.]

"The EEOC argues that Defendant, to avoid liability under Title VII, must prove that Warren, in fact, lied. But we cannot agree that an employer must be forced to prove—presumably in a court of law—more than its good faith belief that a false statement was knowingly made. In the kind of investigation involved in this case, the employer is not acting pursuant to the statute or under color of law, but is conducting the company's own business.

"When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation (not tied to the government) produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice. And, at least when the circumstances give the employer good reason to believe that the fictitious version was the result of a knowingly false statement by one of its employees, the law will not protect the employee's job.

"False statements impair the employer's ability to make sound judgments that may be important to the employer's legal, ethical and economic well-being. So, an employer is entitled to expect and to require truthfulness and

accuracy from its employees in an internal investigation that is exploring possibly improper conduct in the business's own workplace. [Fn. omitted.] . . . And, in carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law. In the workaday world, not every personnel decision involving a false statement (or a cover-up) has to be treated as something like a trial for perjury. Therefore, an employer, in these situations, is entitled to rely on its good faith belief about falsity, concealment, and so forth. [Citations.]

"Warren could properly be discharged based on Defendant's good faith belief that she lied in an internal investigation. In other words, Defendant offered a legitimate nondiscriminatory reason for Warren's termination: Defendant concluded that she had lied in an internal investigation." (*Total System, supra,* 221 F.3d at pp. 1175–1176; see also *McCullough v. University of Arkansas for Medical Sciences* (8th Cir. 2009) 559 F.3d 855, 864–865 [no substantial evidence that plaintiff was fired in retaliation for making sexual harassment complaint against female coworkers: "Contrary to [plaintiff's] conclusory assertion, the [termination] letter does not state that he was fired 'because of the [sexual harassment] complaints he made against [co-workers].' It states that he was discharged for filing *untruthful* complaints, as well as for sexually harassing his co-workers. [Plaintiff's supervisor] likewise testified that he fired [plaintiff] *not* for 'filing a complaint in general,' but rather for filing *untruthful* complaints."].)

We believe the reasoning of these cases is sound, and we adopt it. As the Seventh Circuit has said in a related context: "An employer is forbidden to discriminate against an employee who participates in an investigation of employment discrimination. But participation doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination. [Citations.] This includes making frivolous accusations, or accusations grounded in prejudice. For it 'cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly defame co-employees, without suffering repercussions simply because the investigation was about sexual harassment. To do so would leave employers with no ability to fire employees for defaming other employees or the employer through their complaint when the allegations are without any basis in fact.' [Citation.] . . . '[The antidiscrimination laws were] not designed to "arm employees with a tactical coercive weapon" under which employees can make baseless claims simply to "advance their own retaliatory motives and strategies." . . . Were we to adopt a different standard, an employee could immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint with a government agency. Similarly, an employee could assure himself unlimited tenure by filing continuous complaints with the government agency if he fears that his employer will discover his

duplicitous behavior at the workplace. . . . If we were to adopt [plaintiff's] arguments, it would encourage the abuse of [the antidiscrimination laws] and the proceedings that [they] established.' " (*Hatmaker v. Memorial Medical Center* (7th Cir. 2010) 619 F.3d 741, 745–746.)

█ We thus conclude that in appropriate circumstances, an employer may discipline or terminate an employee for making false charges, even where the subject matter of those charges is an allegation of sexual harassment. In such a case, the disciplinary action is subject to the burden-shifting analysis articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. 792, and adopted by our Supreme Court in *Yanowitz v. L'Oreal USA, Inc., supra*, 36 Cal.4th 1028, 1042, and other cases. Under that analysis, the ultimate question for the fact finder is whether the employer's stated reason for discipline (i.e., that the employee was untruthful during an investigation) was pretextual or whether there is other evidence that, "as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." (*Mamou, supra*, 165 Cal.App.4th at p. 715.)[5]

### B. *No Substantial Evidence of Retaliatory Animus*

Having thus framed the issue, we now turn to whether there is substantial evidence that supports a reasoned inference either that Joaquin's termination was the product of discriminatory or retaliatory animus or that the department's stated reason for terminating Joaquin—i.e., that his claims of sexual harassment were fabricated—was pretextual. In this regard, Joaquin relies on the following evidence, from which he asserts the jury could reasonably have inferred that his termination was the product of retaliatory animus: (1) Sands wanted Joaquin disciplined for having made a sexual harassment complaint; (2) the internal affairs investigation was initiated only after Sands threatened to go to the inspector general to demand action; and (3) internal affairs, Captain Young, and the board of rights all overlooked compelling evidence in favor of Joaquin. For the reasons that follow, we conclude that none of this evidence constitutes substantial evidence of retaliatory animus.

---

[5] "Some courts have muddied the waters by stating that once the employer cites a reason, the 'ultimate issue' is whether the cited reason was a 'pretext.' [Citations.] We have criticized this view before. [Citation.] While 'pretext' is certainly a relevant issue in a case of this kind, making it a central or necessary issue is not sound. The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus. The employer's mere articulation of a legitimate reason for the action cannot answer this question; it can only dispel the *presumption* of improper motive that would otherwise *entitle* the employee to a judgment in his favor. Thus, citing a legitimate reason for the challenged action will entitle the employer to summary judgment only when the employee's showing, while sufficient to invoke the presumption, is *too weak* to sustain a reasoned inference in the employee's favor. That, and not 'pretext,' must be the focus of the judicial inquiry." (*Mamou, supra*, 165 Cal.App.4th at p. 715.)

### 1. *Sands's Alleged Retaliatory Intent*

Joaquin asserts that Sands wanted him disciplined for making a sexual harassment complaint and that Sands's hostility "imbued [the internal affairs investigation] with improper retaliatory motive from the start." However, Joaquin has not identified any evidence that Sands played a role in the internal affairs investigation of his complaint or had the power to direct its result. Further, there is significant evidence to the contrary. The initial investigation of Sands's complaint was conducted by Detective Hector Sanchez of internal affairs. Sanchez testified that he had not met Sands before the investigation began and he did not see him again after the investigation concluded. Sanchez also testified that Sands did not in any way direct how internal affairs conducted the investigation. To the contrary, Sanchez said he followed the department's protocols and procedures when he investigated Sands's complaint and had little or no contact with Sands after the initial interview with him. Sanchez testified in this regard as follows: "Sergeant Sands' role in this investigation was just bringing those allegations to our attention. After he did so, we had minimal contact with Sergeant Sands. And if there was any contact, it was never to inquire about any procedural steps to be taken on an investigation. Frankly, I don't recall any conversations that we had with Sergeant Sands after he initiated the complaint. If my memory serves me correctly, I did not see or speak to Sergeant Sands until the beginning of the Board of Rights. And I don't recall any conversation I had with Sands. If it was, it was trivial stuff, but nothing about the investigation itself."

At trial, Joaquin did not offer any evidence to contradict Sanchez's testimony or otherwise to suggest that Sanchez or any other member of internal affairs harbored the intent to retaliate against him. Thus, there is no evidence from which a jury could reasonably infer that the internal affairs investigation was tainted with retaliatory animus.

In any event, the ultimate recommendation to terminate Joaquin was made by the board of rights, not internal affairs. The board of rights is an administrative tribunal charged under the Los Angeles City Charter with the adjudication of charges of police officer misconduct. (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 317 [74 Cal.Rptr.3d 891, 180 P.3d 935].) A board of rights hearing is "a de novo hearing. (L.A. Charter, § 1070(f).) Comprised of two officers with the rank of captain or above and one civilian, a Board of Rights has the authority to examine witnesses under oath and compel the attendance of witnesses and the production of documents. (*Id.*, § 1070(h), (j).) In a Board of Rights proceeding, the LAPD has the burden of proving each charge by a preponderance of the evidence, and the accused officer has the right to appear in person (and by counsel or a representative, at

the officer's expense) and defend against the charges, and may produce witnesses and cross-examine witnesses. (*Id.*, § 1070(*l*), (m).)" (*Mays v. City of Los Angeles, supra*, 43 Cal.4th at pp. 318–319, fn. 3.) Further, because it is a de novo proceeding, "no reference is made to the evidence adduced in the course of the prior internal investigation. The Board's decision is based solely upon the evidence presented to it." (*Holcomb v. City of Los Angeles* (1989) 210 Cal.App.3d 1560, 1565 [259 Cal.Rptr. 1].)

Because the board of rights hearing is a de novo proceeding, in the absence of direct evidence to the contrary, the jury could not reasonably have inferred that any animus that allegedly infected the internal affairs investigation also infected the board of rights proceeding. And, on the record before it, the jury could not reasonably have concluded that the board of rights itself harbored any retaliatory animus towards Joaquin. Joaquin did not identify the members of the board of rights or introduce any direct evidence that any member of the board of rights knew him or had a desire to retaliate against him. Further, he introduced virtually no evidence concerning the board of rights proceeding itself. Thus, there was no basis on which a jury could have concluded that the board of rights proceeding was, either in its structure or conduct, motivated by retaliatory animus.

### 2. *Sands's Threat to Complain to the Inspector General*

Joaquin next contends that the jury could have concluded that the decision to terminate him was motivated by retaliatory intent because the internal affairs investigation was initiated only after Sands threatened to go to the inspector general to demand action. We do not agree. While there is evidence that Sands threatened to go to the inspector general if internal affairs did not investigate his complaint, there is no evidence that Sands's threat had any effect on the results of the internal affairs investigation. In any event, as we have said, the recommendation to terminate Joaquin was made by the board of rights, not internal affairs, and there is no evidence that any improper motive that may have infected the internal affairs investigation also infected the board of rights.

### 3. *Board's Alleged Overlooking of Evidence*

Joaquin asserts finally that there was "ample evidence from which [the jury] could conclude that the investigators, Captain Young, who received the investigators' report, and the Board consciously overlooked compelling evidence in favor of Joaquin in order to reach an unsupportable conclusion." Specifically, Joaquin identifies two such pieces of evidence: (1) during the internal affairs investigation, Sands said that Sergeant McCallum told him Joaquin had threatened to retaliate if Sands served him with a comment card,

but Sergeant McCallum denied ever making such a statement and (2) Sands told internal affairs that he had been administratively transferred from CTD and that his career had been ruined, while in fact Sands was loaned (not administratively transferred) from CTD and subsequently was assigned to a coveted position.

We do not agree with Joaquin that this evidence was sufficiently substantial to support a conclusion that the board proceeding was tainted with retaliatory animus. As we have said, the decision to terminate Joaquin was made on the basis of the proceeding before the board of rights, not the internal affairs investigation. Thus, to have made the case that the board intentionally overlooked compelling evidence that Sands was not credible, Joaquin would have to have demonstrated to the jury that such evidence was before *the board*, not merely before internal affairs. He failed to do so. Indeed, there was virtually no evidence before the jury concerning the evidence presented to the board.

In any event, although the evidence on which Joaquin relies could perhaps have supported a conclusion that Sands was not credible, it did not compel that conclusion. Credibility determinations depend on a variety of factors, including a witness's demeanor and tone. (*People v. Garcia* (2011) 52 Cal.4th 706 [129 Cal.Rptr.3d 617, 258 P.3d 751].) In view of the scant evidence presented to the jury about the board of rights proceeding, the jury was not in a position to determine whether, under all the circumstances, the board of rights's credibility determinations were reasonable.

## III.   *The Jury Instruction Defining Retaliation Is Inadequate*

The City has not raised the issue of instructional error, and in light of our conclusion that there is no substantial evidence of retaliatory intent, we need not decide whether the jury was correctly instructed. However, our focus on the element of intent highlights a significant flaw in the Judicial Council's retaliation instruction, on which the instruction given in the present case was based.

Judicial Council of California Civil Jury Instruction (CACI) No. 2505—Retaliation states as follows:

"[*Name of plaintiff*] claims that [*name of defendant*] retaliated against [him/her] for [*describe activity protected by the FEHA*]. To establish this claim, [*name of plaintiff*] must prove all of the following:

"1. That [*name of plaintiff*] [*describe protected activity*];

"2. [That [*name of defendant*] [discharged/demoted/[*specify other adverse employment action*]] [*name of plaintiff*];]

"[or]

"[That [*name of defendant*] engaged in conduct that, taken as a whole, materially and adversely affected the terms and conditions of [*name of plaintiff*]'s employment;]

"3. That [*name of plaintiff*]'s [*describe protected activity*] was a motivating reason for [*name of defendant*]'s [decision to [discharge/demote/[*specify other adverse employment action*]] [*name of plaintiff*]/conduct];

"4. That [*name of plaintiff*] was harmed; and

"5. That [*name of defendant*]'s conduct was a substantial factor in causing [*name of plaintiff*]'s harm."

Pursuant to this form instruction, the court in the present case instructed the jury regarding Joaquin's retaliation claim as follows:

"Richard Joaquin claims that the City of Los Angeles retaliated against him for reporting to a supervisor that Sergeant James Sands had sexually harassed him. To establish this claim Richard Joaquin must prove all of the following:

"One, that Richard Joaquin reported that he had been sexually harassed.

"Two, that the City of Los Angeles terminated Richard Joaquin's employment or denied Officer Richard Joaquin promotion to the rank of sergeant.

"Three, that Richard Joaquin's reporting that he had been sexually harassed was a motivating reason for the City of Los Angeles' decision to terminate Richard Joaquin's employment or deny Richard Joaquin promotion to the rank of sergeant.

"Four, that Richard Joaquin was harmed.

"And five, that the City of Los Angeles' conduct was a substantial factor in causing Richard Joaquin's harm."

As we have noted, retaliatory intent is an essential element of a cause of action for unlawful retaliation under FEHA. However, that element is not identified in the CACI retaliation instruction. In the present case, where intent was a significant issue, the omission was material. Indeed, under the unique

facts of the present case, the instruction may have made a plaintiff's verdict inevitable because a jury reasonably could have concluded that the City did not dispute any of the elements on which it was instructed—i.e., that (1) Joaquin reported sexual harassment, (2) the City terminated his employment, (3) Joaquin's report of sexual harassment was a motivating reason for the City's decision to terminate him, (4) Joaquin was harmed, and (5) the City's conduct was a substantial factor in causing Joaquin's harm.

We urge the Judicial Council to redraft the retaliation instruction and the corresponding special verdict form so as to clearly state that retaliatory intent is a necessary element of a retaliation claim under FEHA.

## DISPOSITION

The judgment for Joaquin is reversed. The City shall recover its costs on appeal.

Epstein, P. J., and Manella, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 25, 2012, S200469.