Filed 10/29/13  Young v. Los Angeles Community College Dist. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SELWYN LORD YOUNG, | B233606 consolidated w/B235294 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC396785) |
| v. | |
| LOS ANGELES COMMUNITY COLLEGE DISTRICT, | |
| Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge.  Reversed in part and remanded and affirmed in part.

Atkinson, Andelson, Loya, Ruud & Romo, Warren S. Kinsler, Jennifer D. Cantrell, Suparna Jain; Kohrs & Fiske, Conrad Kohrs and Adam A. Grable for Defendant and Appellant.

Louis J. Cohen; Pine & Pine and Norman Pine for Plaintiff and Respondent.

Defendant and appellant Los Angeles Community College District (District) appeals a judgment upon a $1,126,114 verdict in favor of plaintiff and respondent Selwyn Lord Young (Young), a former employee. The District also appeals post-trial orders awarding Young the sum of $1,062,025 as reasonable attorney fees as well as costs and expenses pursuant to the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq., § 12965, subd. (b).)[1]

The District challenges the sufficiency of the evidence to support the jury's findings with respect to Young's whistleblower retaliation claim, it contends the trial court committed prejudicial error in its evidentiary rulings and in its instructions to the jury, and that the awards of damages and attorney fees are excessive.

We conclude the trial court committed prejudicial evidentiary error and therefore reverse and remand for a partial new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Factual summary*.

Young was employed as a baseball coach at Los Angeles City College (LACC) from February 2006 to October 2007. Initially, he was hired as an assistant baseball coach/part-time adjunct instructor. In April 2006, after the head coach resigned, Young became interim head baseball coach.

At the end of the academic year, in June 2006, Young successfully applied for the head baseball coach position for the spring season ending in May 2007, as well as a PE 552 teaching assignment for fall 2006. At that time, he signed an acknowledgment that "these assignments are for the season as stated and reassignment will be subject to review at the conclusion of the regular season for each sport," and further, "this is an extra assignment of the college and may be terminated at any time."

---

[1] All further statutory references are to the Government Code, unless otherwise specified.

2

Prior to the spring 2007 season, Young requested that his father be hired as his assistant coach. The request was denied on the ground it would violate the District's personnel rules regarding nepotism. In January 2007, Dan Cowgill and Russell Ramsey (uncle of athletic director Michael Miller (Miller)) were appointed as Young's assistant coaches.

Young's team ended the season with a record of two wins and 38 losses.

1. *Young's whistleblowing activity.*

a. *Absenteeism by the assistant coaches.*

Young had problems with his assistant coaches. Cowgill only worked one baseball game during the 2007 season, and Ramsey did not coach any games.

In late February or early March 2007, Dr. Steven Maradian (Maradian), the college president, went to a baseball game and asked Young where the assistant coaches were. Young responded, "they are not here, . . .they're never here." Maradian was concerned about the misuse of public funds and said he would follow up on the matter.

Young subsequently met with athletic director Miller regarding the issue. Miller said "you can't fire them, I have to fire them. And he [said] next year, I'm going to let you hire your own coaches."

In March 2007, Cowgill approached Young and said "he wanted to give [Young] some money for him not coaching and that [Young] would be able to do whatever [he] wanted with it." Cowgill gave Young $2,200 for the baseball team. Young paid $1,000 to an assistant coach, paid $1,000 to his father as a volunteer assistant coach, and also spent $200 on building materials for the team clubhouse and team meals.

b. *Young's concerns about students on the baseball team being overloaded with physical education classes they did not choose*.

In September 2006, Young complained to Ann Gallagher, academic counselor for the student athletes, because students on the baseball team were being made to sign blank "add" cards which "didn't have a name of a class they were going to be put into," causing the students to be added to classes they didn't choose.

3

Young also was concerned that students on the baseball team were being overloaded with physical education class units. Young was concerned the students would have insufficient academic units to transfer to a university, as well as the financial burden to the students of signing up for too many units.

2. *Young's "fall ball" violation, one of the stated reasons for his removal from the coaching position.*

Because LACC had gone "so far down in the dumps," in the fall of 2006, Young signed up his students to participate in the All Wood Fall Baseball League (fall ball). Miller approved the proposal, provided that the team did not use school uniforms or school insurance, and that they would raise the necessary funds and play under a different name. Young and his students engaged in fundraising to defray the costs for tournament fees, travel and other expenses. Instead of being maintained in a separate account, the funds were deposited into the LACC Baseball Foundation account.

LACC had a strict chain of command when it came to approval of expenditure requests. The person initiating the request, such as the coach, was required to present the request to the athletic director, Miller, then Dean Jones, then Jaquelyn Ireland, vice president of academic affairs, and finally, to Maradian, the college president. After Miller denied Young's request for payment of fall ball league entry fees, Young went directly to Maradian and obtained his approval for the expenditure. Young suffered a one-week suspension, and the baseball team was sanctioned by removing five games from the season schedule.

3. *Young's removal from his position as head coach.*

On August 21, 2007, Miller told Young he would not be coaching anymore, and that they were going to take the team in "another direction." The given reasons were the out of protocol check request for fall ball, and installing a batting cage without proper approval. However, Young could continue to teach his classes; he was scheduled to teach PE 552 during the fall of 2007, which would be his fourth semester at LACC.

4

Right after the meeting, Young called Maradian and asked if Maradian had fired him. Maradian said he had not authorized the action and that Young should contact his union representative.

Young's attorney then sent a letter to the District asserting discrimination, retaliation and misuse of education funds.

The following week, Young and his counsel, accompanied by student athletes and community leaders, attended a public meeting of the District's governing board to protest the termination. Young's counsel issued a press release which stated in pertinent part: "Coach Young alleges retaliation for opposing the misuse of educational funds and racial discrimination for disciplining a Caucasian player who was Assistant Coach Cowgill's son. The LACC baseball team had two paid assistant coaches who failed to show up to work. One assistant was the relative of the Athletic Director Mike Miller. The other assistant coach, Dan Cowgill, showed up a few times and then advised the Coach and baseball players that he would not be returning and instead would play golf. Coach Young was required to coach the team himself which led to a parent's complaint to the LACC President and the District that all other teams had at least four coaches on the field."

In response, the Board directed the new interim college president, Kathleen Burke-Kelly (Burke-Kelly), to conduct an investigation into the matter.

Burke-Kelly determined Young had been wrongfully terminated because the termination had to be in writing and had to be approved by the college president. At a meeting in late September 2007, attended by Young, Burke-Kelly and others, Young was told he would be reinstated but he would have to reapply for his position because his application and transcripts has been lost and Young needed to demonstrate his educational qualifications. He also would have to submit to a new criminal background check.[2]

---

[2]     On the earlier employment application dating back to 2004, Young checked the box indicating he had been convicted of a criminal offense, but did not supply the

5

On October 5, 2007, Burke-Kelly issued a report, concluding, inter alia, that Young improperly participated in fall ball, and had ordered T-shirts without approval. In accordance with Burke-Kelly's recommendation, the new college president, Jamillah Moore, removed Young from his position as head baseball coach. However, Young continued teaching his weightlifting class at LACC and his aerobics and weightlifting classes at Southwest College through the end of the semester, which concluded in December 2007.

In November 2007, Young filed a charge of discrimination with the Department of Fair Employment and Housing (DFEH), complaining of sexual harassment by Miller and also alleging he was fired for disciplining a Caucasian baseball player.[3] Young was not offered any classes at LACC or Southwest College for the spring 2008 semester. In April 2008, Young filed an amended charge with the DFEH, alleging the District retaliated against him for filing a charge of discrimination by not offering him any more classes.[4] The DFEH issued a right-to-sue letter.

---

requested details, i.e., "the specific charge, the date and place of convictions, or plea, the fine or sentence received . . . ." Young admitted at trial that he was convicted of two counts of forgery in 1998 for having forged his ex-wife's name on two checks.

[3] In the DFEH charge, Young accused Miller of sexual harassment as follows: "The sexual harassment consisted of sexual comments in unwanted text messages sent to my private cell phone during and after work hours, insisting on unnecessary in-person meetings, asking how much money he would have to pay me to shave my mustache and, staring at my private parts while he was touching his, in these private meetings."

[4] Employer retaliation in the form of a failure to rehire is actionable under FEHA. In *Kelly v. The Conco Companies* (2011) 196 Cal.App.4th 191, a former employee brought an action against his former employer and supervisor, alleging sexual harassment, retaliation, and related causes of action after he was not rehired following his union suspension. (*Id*. at pp. 196-197.) *Kelly* noted, "Section 12940(h) [prohibiting retaliation] affords employees who engage in protected activities . . . the same range of protection from adverse employment actions that are prohibited by section 12940, subdivision (a). (*Yanowitz*[ *v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028,] 1052.) Discriminatory actions under section 12940, subdivision (a) include a refusal to hire or employ." (*Kelly, supra*, 196 Cal.App.4th at pp. 211-212, fn. 12.)

Young also filed a government tort claim with the District. The District denied the claim.

This litigation followed.

II. *Proceedings.*

1. *Pleadings.*

On August 21, 2008, Young filed this action against the District, Michael Miller and Dan Cowgill. The complaint pled six causes of action: (1) race discrimination (§ 12940, subd. (a)); (2) sexual harassment (*id.*, subd. (j)); (3) failure to prevent discrimination and harassment from occurring (*id.*, subd. (k)); (4) retaliation by the District for Young's opposing racial discrimination and sexual harassment (*id.*, subd. (h)); (5) aiding and abetting retaliation under FEHA, as against Cowgill (*id.*, subd. (i)); and (6) whistleblower retaliation (Lab. Code, § 1102.5).

The complaint's whistleblowing allegations, which are at the heart of this appeal, were that Young "reported the misuse of educational funds (being paid to coach and playing golf instead of coming to work) . . . ."

The complaint also alleged, inter alia, that athletic director Miller had sexually harassed Young, and that assistant coach Cowgill had sought Young's termination "because [Young] disciplined Cowgill's Caucasian son."

2. *Jury trial.*

a. *Young's whistleblowing theories.*

In January 2011, the matter came on for a jury trial. In opening statement, Young's counsel asserted two theories of whistleblowing by Young. Young reported to the District that his assistant coaches, Cowgill and Ramsey, did not show up for work, which Young felt was "a misuse of educational funds." (The absenteeism of the assistant coaches was the theory which Young pled in his complaint.)

In addition, Young's counsel asserted Young had complained that student athletes were being enrolled in Miller's physical education classes without their consent and were taking only physical education classes, to the detriment of their education.

7

b. *Young's whistleblowing testimony*.

With respect to the absenteeism of the assistant coaches, Young testified he complained to college president Maradian that his assistant coaches were "never here."

Young also testified he complained to Ann Gallagher, academic counselor for the student athletes, that the students on the baseball team were being added to classes they did not choose and were being overloaded with physical education class units. Young was concerned the students would have insufficient academic units to transfer to a university, and that they would incur the financial burden of signing up for excessive units.

c. *Testimony of whistleblower Howard Taylor (Taylor).*

In addition to Young's own whistleblowing testimony, the key witness at trial was Taylor, who worked at LACC as a community recreation assistant from September 2007 to May 2008, *subsequent* to the events involving Young. Taylor reported to athletic director Miller and his duties included student registration and financial aid.

The District had a running objection to Taylor's testimony on the ground Taylor was not the whistleblower and that any events occurring *after* Young's departure were irrelevant.

Nonetheless, over defense objections, Taylor testified, inter alia:

While Taylor attended LACC, he took five physical education theory classes with Miller. Miller rarely was in class, maybe 25 or 30 percent of the time. The roll sheet had 25 to 40 students registered but maybe 3 or 5 students showed up for class.

With respect to the misuse of educational funds, Taylor testified he observed players being misclassified as California residents. Instead of paying $168 per unit, they were only paying $20 per unit as California residents. This misrepresentation also enabled them to falsify their financial aid applications because at community colleges, one has to be a California resident to obtain financial aid.

In addition, students were receiving grades for classes they were not attending, and receiving academic credit for work not done. Miller told Taylor he could take certain classes with certain instructors "that I wouldn't have to show up for or I wouldn't have to

8

do any work for." Taylor further testified that players "were being paid work study program for not working."

Also, Miller would ask Taylor to perform personal errands, such as taking Miller's clothing to the cleaners, taking his car to have it serviced, and picking up his mail at the post office. Further, while Taylor was working at LACC, Miller directed Taylor to work on Miller's personal business ventures, such as a publishing or book company.

Taylor had access to Miller's office and Miller was rarely at the office. Because Taylor was concerned about the misuse of funds, beginning in January 2008, he photocopied documents from Miller's file cabinets in order to report financial aid improprieties. Among other things, Taylor collected "work study information for the students that were being paid for 30 hours a week, but weren't working any of the hours that they were being paid for." He also collected documentation regarding "out of season meals incurred by Michael Miller." Taylor collected 1,200 pages of documents and wrote a 70-page report detailing his findings.

Taylor was concerned that "students were told to list California high schools as their place of education when they were out-of-state students from other states." He knew they were from out-of-state because he spoke to the students. Also, the high schools "listed on the team rosters were California high schools and not their correct high schools from out of state."

Taylor also observed Miller interacting with students and handing them cash. Students would come in to get money from Miller on a regular basis.

On May 16, 2008, Taylor learned from an assistant coach that Miller had discovered Taylor had been collecting documents from Miller's office. Taylor then requested and obtained a meeting with college president Moore regarding the situation. Burke-Kelly also was present at the meeting. Taylor gave them copies of the documents, as well as his 70-page letter. Following the meeting, Taylor resigned his position, being fearful for his safety.

On August 8, 2008, Taylor went to a meeting of the District's governing board, addressed the issue of financial aid fraud and academic fraud, and supplied the board

9

with his documents.  Thereafter, Taylor reported the matter to the United States Department of Education Office of Inspector General.

d.  *Young's testimony relating to sexual harassment and racial discrimination.*

Young testified Miller sexually harassed him, such as by text messaging him, leering at him, placing "his hand on his groin like he's playing with his self," and offering Young money to shave off his mustache.

Young also testified that Cowgill told him he was "going to be fired or forced to resign right after [Young] disciplined his Caucasian son."  Young did not believe he "would have been threatened with [his] job if [he] had disciplined a minority player."

e.  *Verdict.*

On February 17, 2011, the jury returned a special verdict with special findings. The jury found against Young on his claims for racial and sexual harassment and racial discrimination.

However, the jury found Young did file a report of sexual harassment by Miller and or race discrimination or retaliation by the District, the District retaliated against Young for reporting or opposing harassment and discrimination, and the District failed to take reasonable steps to prevent such retaliation against Young.[5]

The jury further found Young reported information to the District which Young had reasonable cause to believe was a violation of a state or federal statute, and that said report was a motivating factor in the District's failure to rehire him as head baseball coach or adjunct instructor.

---

[5]  Section 12940, subdivision (k), makes it an unlawful employment practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment."  Retaliation is a form of discrimination actionable under section 12940, subdivision (k).  (*Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1239-1240, disapproved on other grounds in *Jones v. The Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173-1174; see Judicial Council of California Civil Jury Instructions (2013) Sources and Authority foll. CACI No. 2527, p. 1408.)

10

With respect to the District's after acquired evidence defense, the jury found: Young did not fail to disclose his 1998 felony convictions for two counts of forgery; and the District would not have discharged Young as head baseball coach or adjunct instructor if it had known of the 1998 felony convictions.

The two individual defendants, Miller and Cowgill, were found not liable.

The jury awarded Young $1,126,114 in damages, consisting of: $124,966 for past economic loss; $805,348 for future lost wages and benefits; $20,800 for future medical expenses; $150,000 for past noneconomic loss; and $25,000 for future noneconomic loss.[6]

On March 29, 2011, the trial court entered judgment on the verdict.

f. *Post-trial proceedings.*

The District moved for a new trial on the grounds of insufficiency of the evidence to support the verdict with respect to retaliation. The District also contended the damages were excessive because Young was a temporary at will employee who had no expectation his assignment would be renewed, and therefore was not entitled to an award of future lost earnings.

On May 12, 2011, the trial court denied the District's motion for new trial.

In other post-trial proceedings, the trial court granted Young's motion for attorney fees pursuant to section 12965, subdivision (b). By stipulation, the March 29, 2011 judgment was amended by interlineation to include the award of attorney fees to Young in the amount of $1,070,025, plus costs and disbursements in the sum of $66,827.02.[7] Cowgill and Miller, as prevailing defendants, were awarded costs of $30,227.35.

---

[6]     Young was 52 years of age at the time of trial. His economist, Dr. Joyce Pickersgill, projected he would work another 14 years, until 2025, and then collect retirement benefits until age 79, in the year 2037.

[7]     An award of reasonable attorney fees in an action brought under FEHA is discretionary, not mandatory. (§ 12965, subd. (b).) Here, the trial court awarded Young the entire lodestar amount that he requested, despite the fact the jury found for the defense on Young's sexual harassment and racial discrimination claims.

11

On June 9, 2011, the District filed a timely notice of appeal from the judgment and the postjudgment order granting Young's motion for attorney fees. On August 18, 2011, the District filed another notice of appeal, specifying the June 22, 2011 order awarding certain costs to Young. The appeals have been consolidated.

## CONTENTIONS

The District contends: the trial court committed prejudicial instructional error and prejudicial evidentiary error; there is insufficient evidence to uphold the verdict with respect to whistleblower retaliation; the trial court erred in denying the District's motion for a new trial on the ground of excessive damages; and the award of attorney fees and costs was excessive.

## DISCUSSION

1. *Prejudicial evidentiary error requires reversal.*

    a. *Summary of the District's evidentiary arguments.*

The District contends the trial court committed prejudicial error in three of its evidentiary rulings. (1) The District contends the trial court erred in admitting the testimony of Taylor, who testified as to his suspicions that the LACC athletic department was involved in various fraudulent activities, because Taylor's testimony was unconnected to Young's whistleblower disclosures and served only to vilify Miller and the District in the eyes of the jury. (2) The District contends the trial court improperly denied its request to call Jack Clark, who would have directly controverted Taylor's evidence by testifying he was hired to investigate Taylor's complaints and found them to be meritless. (3) The District asserts the trial court improperly admitted evidence of a 1997 audit of the athletic department, which was likewise irrelevant and unconnected to Young's claims. According to the District, these rulings, taken together, severely prejudiced the District by depriving it of the ability to present an adequate defense.

12

b. *Standard of appellate review.*[8]

We review the trial court's rulings on the admissibility of evidence for an abuse of discretion. (*Pannu v. Land Rover North America, Inc*. (2011) 191 Cal.App.4th 1298, 1317.)

Broadly " 'speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. . . . Put another way: 'The trial court retains broad discretion in determining the relevance of evidence.' [Citation.] Relevance is statutorily defined as 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) Though not directly germane, a 'matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue . . . .' [Citation.] But the admissibility of such collateral matter also lies within the trial court's discretion. [Citation.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist*. (2006) 139 Cal.App.4th 1356, 1414.)

An evidentiary ruling, "even if erroneous, is not reversible absent a miscarriage of justice. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson, supra,* 46 Cal.2d at p. 836.)"

---

[8]     Evidence Code section 353, the controlling statute, provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

13

(*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 783 [prejudicial evidentiary error in civil case].)

      c.  *Admission of Taylor's testimony on collateral matters*.

As indicated, over objection, Taylor testified to the following:

Student athletes were being misclassified as California residents. Students "were told to list California high schools as their place of education when they were out-of-state students from other states." Instead of paying $168 per unit, they were only paying $20 per unit as California residents. This misrepresentation also enabled them to falsify their financial aid applications because at community colleges, one has to be a California resident to obtain financial aid.

In addition, students were receiving grades for classes they were not attending, and receiving academic credit for work not done.

Further, players "were being paid work study program for not working." Taylor collected "work study information for the students that were being paid for 30 hours a week, but weren't working any of the hours that they were being paid for."

Taylor also observed Miller interacting with students and handing them cash. Students would come in to get money from Miller on a regular basis.

Also, in the course of Taylor's employment at LACC, Miller would ask Taylor to perform personal errands and to work on Miller's personal business ventures.

The District asserts this evidence pertained to collateral matters, in that Young sued for whistleblower retaliation based on the allegation he "reported the misuse of educational funds" by assistant coaches, who played golf instead of coming to work. The District argues Young did not allege he was the whistleblower with respect to any of the above improprieties identified by Taylor, making Taylor's testimony on those collateral subjects irrelevant and inadmissible.

      d.  *Young's theory of admissibility*.

Young's theory of admissibility is that Taylor's testimony was properly admitted under the *logic* of this court's decision in *Johnson v. United Cerebral Palsy/Spastic*

*Children's Foundation* (2009) 173 Cal.App.4th 740, (*Johnson*)*,* involving the "me too" doctrine.  As explained below, Young's reliance thereon is unavailing.

(1) *"Me-too" in employment discrimination cases*.

*Johnson*  considered "the admissibility of me-too evidence under [Evidence Code] section 1101, subdivision (b), in the analogous situation of a FEHA claim for pregnancy discrimination.  Johnson claimed her employer fired her because she was pregnant. In opposing the defendant's motion for summary judgment, Johnson submitted evidence that defendant had fired other women because they were pregnant.  The evidence was declarations of five former employees who claimed they were fired or otherwise discriminated against after telling the employer they were pregnant.  The trial court granted the motion.  (*Johnson, supra,* 173 Cal.App.4th at pp. 744–745, 761–762.) On appeal, Johnson argued that the me-too evidence supported her contention that there were triable issues of fact.  (*Id.* at p. 759.) The Court of Appeal agreed and reversed on this basis among others.  (*Ibid*.)  It rejected the defendant's contention that the declarations were inadmissible propensity evidence under *Beyda* [v. *City of Los Angeles* (1998) 65 Cal.App.4th 511].  (*Johnson, supra,* at p. 760.)  Justice Croskey wrote: '*Beyda* did not address whether the evidence could be admitted under the provisions of subdivision (b) of Evidence Code section 1101.  [**9**]  As discussed below, many courts have held that evidence of the type sought to be introduced by the plaintiff in *Beyda*, and by the plaintiff in the instant case, is admissible under rule 404(b) of the Federal Rules of Evidence . . . to show intent or motive, for the purpose of casting doubt on an employer's stated reason for an adverse employment action, and thereby creating a triable issue of

---

**9**     Evidence Code section 1101 states at subdivision (b):  "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

material fact as to whether the stated reason was merely a pretext and the actual reason was wrongful under employment law.' (*Johnson, supra,* 173 Cal.App.4th at p. 760.)" (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 112 (*Pantoja*).)

The "*Johnson* court concluded . . . the evidence of pregnancy discrimination against other employees 'sets out factual scenarios related by former employees of defendant that are sufficiently similar to the one presented by plaintiff concerning her own discharge by defendant' to be relevant under [Evidence Code] section 1101, subdivision (b). (*Johnson,* supra, 173 Cal.App.4th at p. 767.)" (*Pantoja, supra,* 198 Cal.App.4th at pp. 113-114.)

Similarly, in *Pantoja,* the issue was whether the trial court "erred in not allowing the jury to hear 'me too' evidence, that is, evidence of the employer's alleged gender bias in the form of harassing activity against women employees other than the plaintiff." (*Pantoja, supra,* 198 Cal.App.4th at p. 92.) *Pantoja* held "[t]he me-too evidence was relevant both to prove gender bias and to rebut the defense evidence that [the employer] had a policy of not tolerating harassment and a practice of not directing profanity at individuals. If, as the me-too evidence tended to show, [the employer] lacked this policy and practice when Pantoja was not present and during times when she was not an employee, the jury could rationally infer that he also lacked them when she was an employee and was present." (*Id*. at p. 116.)

(2) *Young's collateral evidence does not come within the parameters of the "me too" doctrine.*

The instant case is clearly distinguishable from *Johnson* or *Pantoja.* In *Johnson*, a woman who claimed her employer fired her because she was pregnant sought to present "me too" evidence the employer had fired other women because they were pregnant. In *Pantoja*, a hostile work environment sexual harassment case, the plaintiff sought to present evidence of the employer's alleged gender bias in the form of harassing activity against female employees other than plaintiff.

16

Here, Young asserted he suffered retaliation on the basis of his whistleblowing in having "reported the misuse of educational funds" by assistant coaches, who played golf instead of coming to work. He also specified his complaint to Gallagher, academic counselor for the student athletes, that the students on the baseball team were being added to classes they did not choose and that they were being overloaded with physical education class units.

Thus, the logic of the "me-too" doctrine would have entitled Young to present evidence that other whistleblowers at the District suffered retaliation by the employer.

Here, however, the "me too" evidence, in the form of Taylor's testimony regarding the other improprieties discussed *ante*, did not show that *other whistleblowers* within the District suffered retaliation. Although Taylor testified regarding academic fraud and other improprieties within the athletic department, said testimony did not link whistleblower activity by an employee to retaliatory conduct by the employer. Therefore, Taylor's testimony relating to collateral matters should have been excluded as irrelevant.[10]

  e. *Trial court's error in admitting Taylor's collateral testimony was prejudicial*.

The admission of Taylor's testimony on collateral matters, unrelated to Young's whistleblowing allegations, was undoubtedly prejudicial.

Taylor was a critical witness at trial and Young's case relied heavily on Taylor's testimony. Indeed, in closing argument, Young's counsel stated to the jury: "*Howard Taylor is the hero of this case*. Howard Taylor couldn't handle watching what Miller was doing to others and he was determined to prove all the fraud that was going on. And he, at his own risk, collected a thousand pages of documents which detailed academic fraud,

---

[10] We note that Taylor's testimony was not entirely irrelevant. For example, Taylor testified that Miller sent flowers or other gifts to Burke-Kelly. This was relevant to whether Burke-Kelly was an impartial decision maker during her September 2007 investigation into Young's removal as head coach.

grade fraud, financial aid fraud, work study fraud, falsifying residency of the students, falsely declaring them as military residents, signing false form 1s." (Italics added.)

Plaintiff's counsel's placing Taylor at center stage is understandable, given Young's circumstances. As noted, Young had been convicted of two counts of forgery, a crime of moral turpitude, placing Young's credibility in issue. The jury was instructed to consider Young's felony conviction in determining whether to believe his testimony.

In fact, the jury rejected significant portions of Young's testimony. The jury returned a mixed verdict. On the sexual harassment and racial discrimination claims, the jury found for the defense. The verdict reflects the jury disbelieved Young's graphic testimony that he had been sexually harassed by Miller and that he suffered racial discrimination for having disciplined a Caucasian athlete.

Further, Young's team finished the season with a record of two wins and 38 losses. That dismal record, in and of itself, could have justified nonrenewal of Young's position as head baseball coach.

In view of the above, Taylor's testimony was crucial to Young's favorable verdict on his whistleblower and retaliation claims. Although the jury disbelieved much of Young's testimony, the jury evidently credited Taylor's testimony. Despite being a tarnished plaintiff, and despite the claims of sexual harassment and racial discrimination not being found credible, Young rode Taylor's coattails to win a sizable verdict.

We conclude it is reasonably probable a result more favorable to the District would have been reached in the absence of the trial court's evidentiary error in the wholesale admission of Taylor's testimony.

2. *The District's challenge to the sufficiency of the evidence to support the verdict with respect to Young's retaliation claims.*

Having found the trial court committed prejudicial evidentiary error, the next issue is whether the matter should be remanded for a new trial. The District contends there is no substantial evidence to support the verdict in favor of Young on the causes of action on which he prevailed, i.e., the claims of retaliation pursuant to Labor Code section 1102.5 and FEHA.

18

When "a *civil* case is reversed on the ground of insufficiency of the evidence, the case is properly terminated; it is not remanded for a new trial." (*People v. Scott* (2000) 85 Cal.App.4th 905, 925.) Thus, in order to determine whether a retrial is warranted on the retaliation claims, it is necessary to address the sufficiency of the evidence to support the verdict in favor of Young on said claims.

a. *Young's disclosure with respect to the absenteeism of his assistant coaches amounted to protected whistleblowing under Labor Code section 1102.5; his disclosure to Gallagher did not.*

The District contends Young's complaint regarding (1) the no-show assistant coaches, and (2) the complaint to Gallagher that his students were being enrolled in too many physical education classes, did not rise to the level of protected activity within the meaning of Labor Code section 1102.5

The statute provides in pertinent part: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, *where the employee has reasonable cause to believe* that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (Lab. Code, § 1102.5, subd. (b), italics added.)

The District contends Young's complaints about his assistant coaches not showing up, and his students being enrolled in too many physical education classes, were not couched in terms of any violation of law perceived by Young, but simply as "internal personnel and administrative concerns." The argument is partially meritorious.

With respect to Young's assertion that students were being added to classes they did not select and were being overloaded with physical education units, Young has not shown "any belief on [his] part that [he] was disclosing a violation of state or federal law in any sort of whistleblowing context, as required for a section 1102.5(b) whistleblowing action." (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1385 (*Patten*) [school principal's disclosure to school officials about needing more staff for safety purposes did not amount to whistleblowing as a matter of law].)

19

On the other hand, Young's complaining about his assistant coaches not showing up "present a whistleblowing archetype—disclosing the allegedly unauthorized use of public assets. [Citation.]" (*Patten, supra,* 134 Cal.App.4th at p. 1386.) Here, as reflected in the press release issued by Young's counsel after he was removed as head baseball coach, Young alleged "retaliation for opposing the misuse of education funds." We conclude Young's complaining about the absenteeism of his assistant coaches rose to the level of protected activity within the meaning of Labor Code section 1102.5, subdivision (b). On this record, the trier of fact could conclude Young had *reasonable cause to believe* he was disclosing a violation of state or federal law.

    b. *The District's arguments relating to causation.*

The District contends Young failed to prove causation because his protected activity of complaining to the District's governing board, and filing the DFEH complaints, occurred *after* the adverse decision not to rehire him was taken. The argument is unpersuasive. We conclude Young presented sufficient evidence of causation to warrant retrial.

With respect to Young's claim of whistleblower retaliation (Lab. Code, § 1102.5), the record reflects Young complained to college president Maradian *prior to* the adverse employment action. As discussed above, in late February or early March 2007, Maradian came to a baseball game and asked Young where the assistant coaches were. Young responded, "they are not here, . . .they're never here." The adverse employment action was subsequent to that disclosure.

As for Young's claim of retaliation pursuant to FEHA, the chronology is as follows: In November 2007, Young filed a charge of discrimination with the DFEH, complaining of sexual harassment by Miller and also alleging he was fired for disciplining a Caucasian baseball player. Young was not offered any classes at LACC or Southwest College for the spring 2008 semester. In April 2008, Young filed an *amended c*harge with the DFEH, alleging the District retaliated against him for filing a charge of discrimination by not offering him any more classes. Accordingly, there is sufficient

20

evidence in the record to show the District did not rehire Young *after* he filed the initial DFEH complaint.

In sum, because there is sufficient evidence to support Young's claims of whistleblower retaliation (Lab. Code, § 1102.5) and retaliation under FEHA, a limited new trial on those issues, as well as failure to prevent retaliation (§ 12940, subd. (k)), is warranted.

c. *Guidance on remand with respect to evidentiary issues.*

We provide the following guidance to the trial court on remand (Code Civ. Proc., § 43), with respect to certain evidentiary issues that have been raised on appeal.

Notwithstanding our determination the trial court committed prejudicial evidentiary error in admitting Taylor's testimony on collateral matters unrelated to Young's whistleblowing allegations, nothing herein should be construed as calling for Taylor's categorical exclusion as a witness on retrial. Instead, once a proper foundation is shown, the trial court should admit Taylor's testimony insofar as it is relevant to Young's claims against the District (Evid. Code, § 350), that is to say, has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

As for the District's contention the trial court abused its discretion in excluding Jack Clark as a rebuttal witness on the ground he was not designated by the District on its pretrial witness list (L.A. Super. Court, Local Rule 3.25(f)(1)), there is no reason to believe that circumstance will recur on remand. Inclusion of Clark on the pretrial witness list will obviate this issue.

3. *Instructional issues.*

In order to provide additional guidance to the trial court on remand (Code Civ. Proc., § 43), we also address the District's contentions relating to instructional error.

a. *Denial of instruction re at will status*.

The District contends the trial court erred in refusing to instruct the jury regarding Young's at will status under the Education Code, which resulted in an excessive damages award.

(1) *The initial proposed special instruction.*

The District proposed the following special instruction: "*Plaintiff was instructed that* he was in an 'at-will' employment relationship with Defendant LACCD at all times which may be ended by either the employer or the employee, at any time, for any reason, or for no reason at all with or without notice with respect to his job as a baseball coach and adjunct professor."

The District argues the instruction was necessary for the jury to understand Young's at-will status, because Young's employment status meant he was terminable at any time, and had no expectation for future employment with the District. The District concedes that Young's lack of contractual or tenure rights to reemployment would not have defeated his retaliation claim, but the at-will instruction was material to *the amount* of the damages that were recoverable by Young, assuming he proved his case for liability. The District asserts the trial court erred in refusing the instruction because it was supported by testimony concerning Young's at will status.

The argument is meritless. "A party is entitled upon request to correct, *nonargumentative* instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 572.) The District's proposed instruction that "*Plaintiff was instructed that* he was [an at-will employee]" was argumentative and therefore not a proper jury instruction. Further, a "trial judge is not required to correct a requested instruction which is incomplete or erroneous." (*Shaw v. Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 158.) Thus, the trial court had no duty to rewrite the proposed instruction.

Moreover, the case went to the jury on claims of disparate treatment based on race (§ 12940, subd. (a)); retaliation for opposing discrimination and harassment (*id*., subd. (h)); quid pro quo sexual harassment; hostile work environment (*id.,* subd. (j)); and failure to prevent harassment, discrimination or retaliation (*id*., subd. (k)). An employee's status as an at will employee is not germane to those issues.

(2) *The revised proposed special instruction.*

The District submitted a revised instruction, which the trial court also rejected. We note the District's opening brief fails to quote the contents of its proposed revised instruction. That revision, which was read into the record by defense counsel, stated:

"If you find that defendants have so proved by a preponderance of the evidence, then plaintiff was instructed that he was an at-will – I'm sorry, was in and [sic] at-will employment relationship with defendant LACCD at all times which may be ended by either the employee or the employer at any time for any reason or for no reason at all with or without notice with respect to his job as a baseball coach and adjunct professor. This is subject, however, to the collective bargaining agreement, exhibit 81, article 14 sub (b), sub (6), any contract to which plaintiff was a party and the Fair Employment and Housing Act."

On its face, the revised proposed special instruction was unintelligible and properly was refused.[11]

b. *Allegedly conflicting instructions regarding Young's 1998 felony convictions.*

The trial court gave the following instruction, CACI No. 211, with respect to a prior conviction of a felony: "You have heard that a witness in this trial has been convicted of a felony. You were told about the conviction only to help you decide whether you should believe the witness. You must not consider it for any other purpose."

The trial court also instructed the jury on CACI No. 2506, after acquired evidence, as follows: "[The District] claims that it would have discharged [Young] anyway if it had know that [Young] failed to disclose 1998 felony convictions for 2 counts of forgery.

---

[11]    The District has not shown why the standard jury instructions were insufficient. CACI No. 2400, pertaining to at will employment, provides: "An employment relationship may be ended by either the employer or the employee, at any time, for any [lawful] reason, or for no reason at all. This is called 'at-will employment.'  [¶]  An employment relationship is not 'at will' if the employee proves that the parties, by words or conduct, agreed that the employee would be discharged only for good cause."

23

You must decide whether the District has proved all of the following: [¶] 1. That [Young] failed to disclose his felony convictions for 1998 forgery; [¶] 2. That [Young's] misconduct was sufficiently severe that the District would have discharged him because of that misconduct alone had the District known of it; and [¶] 3. That the District would have discharged [Young] for his misconduct as a matter of settled District policy."

The District contends that while each instruction may have correctly stated the law, the two instructions, when taken together, created an irreconcilable conflict capable of misleading or confusing a person of ordinary intelligence. On the one hand, CACI No. 211 required the jurors to consider Young's felony convictions solely for the purpose of determining his credibility; on the other hand, CACI No. 2506 directed the jury to consider the felony convictions as part of the District's "after-acquired evidence" defense.

Thus, the District does not claim either CACI No. 211 or CACI No. 2506 were incorrect. Rather, it asserts the giving of both instructions confused the jury.

The record reflects that at the time the District objected to the giving of CACI No. 211, the trial court inquired, "what is the basis of your objection?" Defense counsel responded: "Well, we simply don't see a need for it. We believe it's covered adequately, your honor, in the steps that that are given for after acquired evidence."

Thus, the only objection which the District raised below was that CACI No. 211 was unnecessarily *redundant* and was adequately covered by CACI No. 2506, the after acquired evidence instruction. As Young points out, the redundancy objection did not remotely suggest to the trial court the existence of any *inconsistency* between the two instructions. Having failed to argue inconsistency below, the District cannot assert error on that ground on appeal. (*Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1167 [under doctrine of waiver, party loses right to appeal issue caused by affirmative conduct or by failure to take proper steps at trial to avoid or correct error].) Had the District duly objected below, the trial court could have easily added language to harmonize the two instructions.

24

Further, the two instructions are reconcilable. CACI No. 211 (witness's prior conviction of felony) relates to the fact of Young's felony conviction, which fact was to be considered solely for purposes of determining his credibility. CACI No. 2506 (after acquired evidence) does not concern the fact of the conviction, but rather, Young's alleged *nondisclosure* of the conviction to his employer. There was no conflict.

Moreover, the record reflects the jury was not misled. The special verdict form asked a series of questions relating to the District's after acquired evidence defense, to wit: "18A. Did Selwyn Young fail to disclose his 1998 felony convictions for two counts of forgery? [The jury unanimously responded 'No.'] [¶] . . . [¶] 18C. Would LACCD have discharged Selwyn Young as head baseball coach if it had known that Selwyn Young had 1998 felony convictions for two counts of forgery? [The jury unanimously responded 'No'] [¶] 18D. Would LACCD have discharged Selwyn Young as Adjunct Instructor . . . if it had known that Selwyn Young had 1998 felony convictions for two counts of forgery? [The jury unanimously responded 'No']."

It would have been impossible for the jury to respond to these questions on the special verdict form had it ignored Young's convictions for all purposes other than credibility.

For all these reasons, this claim of instructional error fails.

c. *No error in giving CACI No. 2505*.

With respect to the essential elements of a claim for retaliation under section 12940, subdivision (h), the trial court instructed the jury pursuant to CACI No. 2505 as follows:

"[Young] claims that [the District] retaliated against him for reporting, opposing or filing a complaint of race discrimination, sexual harassment and/or retaliation. To establish this claim, [Young] must prove all of the following: [¶] 1. That [Young] reported discrimination, opposed discrimination or filed a complaint for race discrimination, sexual harassment and/or retaliation; [¶] 2. That [the District] discharged [Young's] employment at Los Angeles City College or Southwest College [or] That [the District] engaged in conduct that, taken as a whole, materially and adversely affected the

25

terms and conditions of [Young's] employment; [¶] 3. That [Young's] reporting, opposing or filing a complaint of discrimination, harassment or retaliation was a motivating reason for [the District's] decision to discharge [Young]; [¶] 4. That [Young] was harmed; and [¶] 5. That [The District's] conduct was a substantial factor in causing [Young's] harm."

(1) *Record reflects the District requested CACI No. 2505 be given.*

As a preliminary matter, the jury instruction form reflects it was the District which requested this instruction. In an attempt to avoid the doctrine of invited error, the District asserts it requested CACI No. 2505 only after "the trial court indicated it would give some version of CACI [No.] 2505." However, in neither of its briefs does the District support that assertion with a citation to the record.

(2) *The given instruction properly required the jury to determine whether the District had a retaliatory intent.*

Leaving aside the issue of invited error on the part of the District, the District relies on dictum in a recently decided case, *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207 (*Joaquin*), to the effect that CACI No. 2505 fails to require retaliatory intent.

*Joaquin* is a thin reed on which to rely. The issue of instructional error was not even raised in *Joaquin*, and *Joaquin* was not decided on that basis. In this regard, *Joaquin* stated: "*The City has not raised the issue of instructional error, and in light of our conclusion that there is no substantial evidence of retaliatory intent, we need not decide whether the jury was correctly instructed.* However, our focus on the element of intent highlights a significant flaw in the Judicial Council's retaliation instruction [CACI No. 2505], on which the instruction given in the present case was based." (*Joaquin, supra,* 202 Cal.App.4th at p. 1229, italics added.)

*Joaquin* then went on observe, "retaliatory intent is an essential element of a cause of action for unlawful retaliation under FEHA. However, that element is not identified in the CACI retaliation instruction. In the present case, where intent was a significant issue, the omission was material. Indeed, under the unique facts of the present case, the

26

instruction may have made a plaintiff's verdict inevitable because a jury reasonably could have concluded that the City did not dispute any of the elements on which it was instructed—i.e., that (1) Joaquin reported sexual harassment, (2) the City terminated his employment, (3) Joaquin's report of sexual harassment was a motivating reason for the City's decision to terminate him, (4) Joaquin was harmed, and (5) the City's conduct was a motivating factor in causing Joaquin's harm. [¶] We urge the Judicial Council to redraft the retaliation instruction and the corresponding special verdict form so as to clearly state that retaliatory intent is a necessary element of a retaliation claim under FEHA." (*Joaquin, supra*, 202 Cal.App.4th at pp. 1230-1231.)

Thereafter, the Judicial Council Advisory Committee on Civil Jury Instructions noted: "This instruction has been criticized in dictum because it is alleged that there is no element requiring retaliatory intent. (See *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1229–1231 [136 Cal.Rptr.3d 472].) The court urged the Judicial Council to redraft the instruction and the corresponding special verdict form so as to clearly state that retaliatory intent is a necessary element of a retaliation claim under FEHA. The jury in the case was instructed per element 3 'that Richard Joaquin's reporting that he had been sexually harassed was a motivating reason for the City of Los Angeles' decision to terminate Richard Joaquin's employment or deny Richard Joaquin promotion to the rank of sergeant.' *The committee believes that the instruction as given is correct for the intent element in a retaliation case. However, in cases such as Joaquin that involve allegations of a prohibited motivating reason (based on a report of sexual harassment) and a permitted motivating reason (based on a good faith belief that the report was falsified), the instruction may need to be modified to make it clear that plaintiff must prove that defendant acted based on the prohibited motivating reason and not the permitted motivating reason.*" (Judicial Council of Calif., Civil Jury Instructions (2013) Directions for Use foll. CACI No. 2505, p. 1339, italics added.)

We agree with the CACI committee that CACI No. 2505 is correct with respect to the intent element in a retaliation case. Here, the jury was instructed per element 3 of CACI No. 2505 that Young was required to prove that his "reporting, opposing or filing

27

a complaint of discrimination, harassment or retaliation was a motivating reason for [the District's] decision to discharge [Young]." The given instruction properly required the jury to determine that the District had a retaliatory intent in discharging Young. There was no instructional error.

### 4. *Remaining issues not reached*.

In view of the above, it is unnecessary to address the District's contentions relating to other evidentiary rulings, excessive damages, or any other issues.

### 5. *Scope of issues on remand.*

For the guidance of the parties and the trial court, we set forth the scope of the issues for retrial.

As noted, at trial, the defense prevailed on the first cause of action (race discrimination) and the second cause of action (sexual harassment), eliminating these claims. The jury also returned a defense verdict on the fifth cause of action (aiding and abetting harassment violations of FEHA), eliminating said cause of action.

With respect to the third cause of action, i.e., "failure to prevent harassment, discrimination or retaliation," the jury found Young was not subjected to harassment or discrimination, but that he was subjected to *retaliation* and the District failed to take reasonable steps to prevent retaliation from occurring. As discussed *ante*, at footnote 5, section 12940, subdivision (k), makes it an unlawful employment practice for an employer to fail to prevent retaliation. Because Young is entitled to a new trial on his claim he suffered retaliation for filing a claim with the DFEH, he is also entitled to pursue his claim against the District for failing to prevent retaliation under FEHA. (§ 12940, subd. (k).)

In addition to the cause of action for failure to prevent retaliation (§ 12940, subd. (k)), the causes of action which need to be retried are the fourth cause of action, retaliation under FEHA (§ 12940, subd. (h)), and the sixth cause of action, whistleblower retaliation (Lab. Code, § 1102.5).

Specifically, on Young's FEHA claim, the issue on retrial is simply whether he was subjected to retaliation for having filed a charge of discrimination with the DFEH.

As for Young's whistleblower claim (Lab. Code, § 1102.5), the only remaining whistleblower allegation is Young's disclosure that his assistant coaches were failing to show up for work.

As for the District's affirmative defense of after acquired evidence, i.e., the forgery convictions, which was resolved in Young's favor at trial, that too shall be retried.

## DISPOSITION

The amended judgment is reversed and the matter is remanded for a limited new trial with respect to Young's claims against the District for retaliation pursuant to FEHA (§ 12940, subd. (h)), failure to prevent retaliation (§ 12940, subd. (k)), and whistleblower retaliation pursuant to Labor Code section 1102.5, subdivision (b), to be guided by the principles set forth herein.  The award of attorney fees and costs to Young is also reversed.  In all other respects, the amended judgment is affirmed.  The District shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

KITCHING, J.

29