Filed 5/29/14  Sanders v. Central Freight Lines CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOWARD SANDERS,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CENTRAL FREIGHT LINES, INC.,<br><br>    Defendant and Appellant. | A134752<br><br>(Alameda County<br> Super. Ct. No. RG09454517) |

        This is an appeal from judgment following a bench trial in a wrongful termination lawsuit in favor of plaintiff Howard Sanders against his former employer, Central Freight Lines, Inc. (Central).  Following trial, the trial court determined Sanders had been wrongfully discharged in violation of a fundamental public policy – to wit, for protesting his workplace safety concerns.  For reasons set forth below, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

        Sanders was employed by Central, a freight delivery company, as a pickup and delivery driver for about seven years until being suspended April 24, 2008, and terminated April 29, 2008, the date he received his final paycheck.

        The events leading to Sanders' termination are as follows.  On April 24, 2008, Sanders arrived at his work station in Hayward and was assigned to a tractor trailer already loaded with freight. This tractor trailer was one of the few tractor trailers at Central equipped with an "orange tuck-away lift gate" (orange lift gate).  Sanders had previously used the orange lift gate several times, and found it very heavy and awkward

1

to operate. In fact, Sanders had once strained his back while attempting to manually unfold the heaviest portion of the gate to unload freight, although he did not report the injury because he was still able to work. Nonetheless, in order to avoid further injury, Sanders decided to try to avoid using the orange lift gate by requesting to switch to a trailer equipped with another type of lift gate.

Sanders' dissatisfaction with the orange lift gate stemmed from its weight and design. The lift gate is comprised of three interlocking parts, some manually-operated parts and some automatic parts, which unfold to form a platform permitting drivers to move freight from the trailer's floor level to ground level. The lift gate is designed to be used in circumstances where freight must be unloaded at a facility without a raised platform. It holds a maximum capacity of 4,500 pounds, significantly more weight than other types of lift gates. To open the orange lift gate, the driver would first push the control button to turn on a hydraulic system to lower the gate. Once the gate was lowered, the driver would be required to manually unfold the remaining three sections of the gate to create a level platform. The first section of the orange lift gate was the heaviest section, weighing approximately 150 to 200 pounds. According to Sanders, as well as the other drivers, it is not possible to maintain a straight back while unfolding this section, which greatly increases the opportunity for sustaining a back injury.

Thus, because, on the day in question, Sanders was concerned about getting injured by the orange lift gate, he contacted the yard supervisor and requested to be reassigned to a tractor trailer with another type lift gate. Although the yard supervisor agreed, Sanders was immediately approached by Aaron Holstein, the Hayward terminal manager, who demanded to know why his tractor trailer assignment had been changed. Sanders explained to Holstein that he had requested to work on a tractor trailer without an orange lift gate because he had previously strained his back using such gate and because it was "too heavy" and "unsafe." Holstein asked Sanders to demonstrate the correct procedure for lowering the orange lift gate. When Sanders refused to manually open the first section of the gate (to wit, the heaviest section), Holstein did it himself and declared it was in working order. Holstein then asked Sanders whether he was "refusing to work."

2

Sanders replied that he was not, and that he simply sought reassignment to a tractor trailer without an orange lift gate. Holstein then told Sanders to go to his office to write down a report of what had occurred.

Sanders complied with Holstein's direction and submitted a written statement of what had occurred. Among other things, Sanders wrote in this statement, that: "The lift gate is a very heavy lift gate, The last time I had this lift gate I pulled a muscle in my back. I feel for me the lift gate was too heavy . . . and I asked for freight to be put in another liftgate trailer that was right next to the other one. I was told no; and if I didn't take it, I was refusing to work. It's not that I didn't want to work, but I don't want to hurt my back again. [¶] . . . [¶] . . . Don't no driver [sic] here like this trailer. . . . [¶] I don't have a problem with working but I do have a problem with hurting my back again. I just ask for a better and lighter lift gate so I can do my job and there was another trailer that was empty right next to it. It would have only took [sic]10 minutes to reload."

After receiving Sanders' written statement, Holstein contacted representatives of Central's human resources department, located in Texas. After discussing the incident with a member of this department, Holstein verbally recommended termination of Sanders' employment. His recommendation was accepted, and Holstein thus advised Sanders that he was suspended from work effective immediately, and that he should call the Central office every morning at 8:00 a.m. to ask whether he would be assigned work that day.

Holstein also prepared a "Separation Notice," which he submitted to Central's human resources department on April 24, 2008. This notice set forth Holstein's recommendation to terminate Sanders, but failed to comply with the notice's written instruction, stated on the first page of the document, to identify all reasons or justifications for his recommendation. Specifically, as Holstein subsequently admitted, this notice stated that Sanders was suspended "for violations of standards of conduct, prohibited conduct," which referred only to "his refusal to do the work assigned to him," but not to any failure by Sanders to comply with corporate policy requiring him to report his earlier injury from the orange lift gate, the reason Holstein later provided as the basis

3

of his decision to terminate Sanders. Holstein's Separation Notice also failed to comply with the written instruction to attach all relevant documentation. In particular, the notice did not attach Sanders' written statement in which he expressly denied that he was refusing to work and explained that he merely was requesting reassignment to a trailer with a safer lift gate.

Sanders, in the meantime, complied with Holstein's suspension orders, leaving the work site and calling in each subsequent morning at 8:00 a.m. to request work. However, each day he was told no work was available and, ultimately, on April 29, 2008, he was given his last paycheck and officially terminated. Within a day to two, Sanders wrote a letter to Central's human resources department seeking reinstatement and requesting a hearing. In this letter, Sanders explained that he believed "[Holstein] was wrong for terminating me because Central goes by safety first," and that his refusal to use the orange lift gate "was neither insubordinate or [sic] disrespectful," in that he offered to use an alternative piece of equipment that was available. However, Sanders received no response to his letter from Central.

Thus, on May 26, 2009, Sanders filed his original complaint, later amended, asserting several causes of action based on wrongful termination against Central.[1] A bench trial began October 11, 2011.

During trial, several Central drivers were called to testify. These drivers for the most part uniformly confirmed the orange lift gate was very heavy, unsafe, and designed in such a way that it was impossible to maintain a straight back while manually unfolding the gate's interlocking sections, thereby posing a significant risk of injury. In particular, defense witness Gutierrez, a driver hired by Central after Sanders' termination, was

---

[1] The operative Second Amended Complaint, filed May 10, 2010, identified the following causes of action: (1) "workplace safety," (2) disability discrimination (dismissed by Sanders pretrial), (3) failure to reinstate/rehire, (4) violations of Labor Code section 6310 through 6312, (5) racial discrimination, (6) estoppel (dismissed by Sanders pretrial), and (7) tortious discharge in violation of public policy. The trial court's judgment for Sanders was based only on his causes of action for wrongful discharge in violation of public policy and for violations of Labor Code section 6310 through 6312.

4

shown in a videotape demonstrating proper use of the orange lift gate. This videotape established the inability of the user to maintain an ergonomically-safe straight back while unfolding the interlocking sections. In addition, Gutierrez himself acknowledged in court that the orange lift gate was very heavy and that he had heard other drivers complain about having to use it. Gutierrez also confirmed the orange lift gate was no longer in use at the Hayward work site.

Other drivers testifying at trial acknowledged that, like Sanders, they would try to avoid using the orange lift gate by requesting assignment to a different tractor trailer, by unloading the freight by hand, by soliciting help from other persons at the delivery site, or by returning the freight unloaded. In addition, at least two drivers aside from Sanders acknowledged having been injured using the orange lift gate. And the employee performing maintenance on the orange lift gate testified that the drivers complained about having to use it, and that some "were worried about getting hurt [on it] eventually."

Holstein, in turn, testified for the defense. He stated that his recommendation to terminate Sanders was based upon Sanders' failure to report having strained his back using the orange lift gate, a violation of corporate policy. In addition, Holstein stated that he also considered the fact that Central was overstaffed and "headed into a down economy." However, Central's corporate documents demonstrated that the company hired drivers on March 31 and April 23, 2008, just days before Sanders' April 24th termination, and did not lay-off any employees for economic reasons until December 2008.

Holstein also acknowledged faxing a document to Central's human resources department on May 7, 2008, about a week after Sanders' termination, setting forth a rationale for recommending his termination. According to this document, Holstein explained that his decision arose from Sanders' insubordination for failure to report his previous injury from the orange lift gate. Holstein admitted, however, that the Separation Notice he prepared on the day of Sanders' suspension did not identify this reason.

Following trial, the trial court found in favor of Sanders on the causes of action for wrongful termination in violation of fundamental public policy and for violations of

5

Labor Code sections 6310 through 6312.[2]  The court thus awarded him $293,253 in damages, plus prejudgment interest at a rate of 10 percent per annum, as well as $13,545 in lost wages and benefits, plus prejudgment interest at a rate of seven percent per annum. Judgment was entered in favor of Sanders and against Central on January 31, 2012.  This timely appeal followed.

## DISCUSSION

Central challenges the judgment in favor of Sanders on several grounds.  First, Central contends the trial judge misapplied the legal standard governing claims for wrongful termination in violation of fundamental public policy, also known as *Tameny* claims.  (See *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 (*Tameny*).)  More specifically, Central contends the trial court failed to find the unsafe condition reported by Sanders (to wit, the risk of injury from use of the orange lift gate) implicated a fundamental public policy by, for example, creating a safety risk to persons other than Sanders.  Central also contends the trial court disregarded or otherwise misapplied the law with respect to its primary defenses of mixed motive and mistake.  Based upon these purported legal errors, Central contends de novo review, rather than the standard review for substantial evidence, is required.  Finally, Central challenges the trial court's award of emotional distress damages on the ground that such damages are not recoverable in wrongful termination cases in this State.  We address each of the contentions below.

---

[2]     Labor Code sections 6310 through 6312 generally prohibit employers from discharging an employee who has made a written or oral complaint with respect to employee safety or health.  Central does not specifically challenge the trial court's finding that Central violated these statutory provisions other than to state that, based on the "primary right theory," Sanders has only one cause of action – to wit, for wrongful termination in violation of public policy.  However, Central fails to set forth any reasoned argument for reversing the trial court's finding with respect to the Labor Code violations. Nor does Central attempt to prove any portion of the damages award in this case is duplicative or otherwise miscalculated.  In fact, Central concedes the damages allegations are the same as to all of Sanders' causes of action.  As such, we conclude there is no need on appeal for this court to address the trial court's finding that Central violated these Labor Code provisions.  (*People v. Dubose* (2014) 224 Cal.App.4th 1416, 1432 [when no effective relief may be afforded, an issue on appeal is moot].]

**I.    Was Central properly found liable for wrongful discharge in violation of fundamental public policy?**

The parties generally agree with the substantive law governing claims for wrongful termination in violation of fundamental public policy (*Tameny* claims).  This law is quite well-established, particularly where, as here, the implicated public policy relates to workplace safety.  Specifically, "[a]n employer who fires an employee in retaliation for protesting unsafe working conditions violates fundamental public policy, and the discharged employee may bring a tort action for wrongful discharge in addition to his or her statutory remedies." (*Barton v. New United Motor Manufacturing, Inc*. (1996) 43 Cal.App.4th 1200, 1205.)  " 'The safety of employees in the work place has long been a matter of prime legislative concern.  Labor Code section 6400 provides:  "Every employer shall furnish employment and a place of employment which are safe and healthful for the employees therein."  Section 6401 provides:  "Every employer . . . shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful.  Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees."  Section 6402 provides:  "No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful."  Section 6403 provides in part:  "No employer shall fail or neglect . . . [¶] (c) To do every other thing reasonably necessary to protect the life, safety, and health of employees."  And Section 6404 provides:  "No employer shall occupy or maintain any place of employment that is not safe and healthful." ' (*Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 297-298 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015].)" (*Jenkins v. Family Health Program* (1989) 214 Cal.App.3d 440, 448.)

"The *Hentzel* court stated:  'It requires little analysis to perceive that the legislative purpose underlying these provisions would be substantially undermined if employers were permitted to discharge employees simply for protesting working conditions which they reasonably believe constitute a hazard to their own health or safety, or the health or safety of others. Achievement of the statutory objective -- a safe and healthy working

7

environment for all employees -- requires that employees be free to call their employer's attention to such conditions, so that the employer can be made aware of their existence, and given opportunity to correct them if correction is needed. The public policy thus implicated extends beyond the question of fairness to the particular employee; it concerns protection of employees against retaliatory dismissal for conduct which, in light of the statutes, deserves to be encouraged, rather than inhibited.' (*Hentzel v. Singer Co.* [(1982)] 138 Cal.App.3d at p. 298.)" (*Jenkins v. Family Health Program, supra,* 214 Cal.App.3d at p. 448.)

"The Legislature has provided for the protection of employees who engage in certain activities relating to safety and health matters 'by prohibiting discharge or discrimination because of such activity (§ 6310, subd. (a)), by declaring victims of discharge or discrimination to be entitled to reinstatement and reimbursement for lost wages and work benefits (§ 6310, subd. (b)), and by providing for the maintenance of suit by the Labor Commissioner on behalf of victims under certain circumstances (§ 6312).' (*Hentzel v. Singer Co., supra,*138 Cal.App.3d at p. 298.) The *Hentzel* court determined the remedy under section 6312 is neither exclusive nor requisite to maintenance of a private cause of action. (*Hentzel v. Singer Co., supra*, 138 Cal.App.3d at pp. 302-303.) Thus, there is a private right of action for retaliatory discharge for protesting unsafe working conditions." (*Jenkins v. Family Health Program, supra,* 214 Cal.App.3d at p. 449.)

In this wrongful termination case, we conclude, based upon review of the entire record, that substantial evidence indeed supports the trial court's conclusion that Central terminated Sanders in response to his protestations about an unsafe working condition at his worksite – to wit, the unsafe operation of the orange lift gate.[3] As the trial court

---

[3] Central contends the "at-will relationship between Central and Sanders, enabling Central to terminate it at any time, for any reason or no reason, necessarily imposes upon Sanders a very high burden of proof." However, Central cites no authority for this supposedly elevated burden of proof, and we have found none in the case law set forth above. As such, we will simply apply the principles expressed in these decisions in a straightforward manner, without adopting this proposed heightened evidentiary standard.

8

noted, the Central workers testifying both for and against Central were consistent in noting the orange lift gate's undue heaviness and the inability to operate it while maintaining proper posture, circumstances undoubtedly increasing the operator's risk of injury, particularly, as one Central driver testified, after multiple uses of the lift gate in a single day. In fact, not just Sanders, but at least two other Central drivers testified to having sustained injury while operating the orange lift gate, and the employee responsible for maintaining the lift gate testified that other drivers complained about its excessive heaviness and were concerned about getting injured by it.

In addition, while Holstein may have denied that his decision to terminate Sanders stemmed from Sanders' protestations about the orange lift gate's lack of safety, there is substantial evidence suggesting otherwise. (See *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 702 ["The central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort"].) For example, while Holstein stated after the fact that his decision stemmed from Sanders' insubordination in failing to follow corporate policy requiring immediate reporting of injury, Holstein failed to identify this reason in the Separation Notice he submitted to Central headquarters the day of Sanders' suspension. This official corporate document instructs on its face that the submitting person must identify the reason for separation and include all relevant supporting documentation. Here, however, the Notice submitted by Holstein not only failed to indicate the identified reason for recommending Sanders' termination, it also failed to include a copy of Sanders' own written report of what had transpired, in which Sanders explained that he had not refused to work, but had merely requested reassignment to a trailer without the orange lift gate.

And, finally, while Holstein also stated after the fact that he considered Central's hiring needs (or lack thereof) when deciding to terminate Sanders, documentary evidence

9

admitted at trial reflected otherwise.[4]  Specifically, Central documents established that at least two workers were hired just before Sanders' termination, suggesting additional workers were in fact needed, and that no layoffs occurred due to business conditions until December 16, 2008.

This substantial evidence suffices to prove the employer's tort liability for purposes of a *Tameny* claim.  (*Jenkins v. Family Health Program, supra,* 214 Cal.App.3d at pp. 448-449; *Barton v. New United Motor Manufacturing, Inc., supra,* 43 Cal.App.4th at p. 1205.)  Moreover, this evidence flatly undermines Central's rather remarkable claims on appeal that the evidence failed to show the orange lift gate was unsafe or had caused injury to any Central driver besides Sanders.

Of course, as stated above, Central also contends substantial evidence is *not* the appropriate standard here because of the trial court's purported legal errors in applying the law with respect to Sanders' *Tameny* claim.  For reasons stated below, we disagree.

First, with respect to Central's argument that the trial court failed to consider its defenses of mixed motive and mistake, a brief look at the statement of decision proves otherwise.  Specifically, after describing in detail the relevant evidence regarding Holstein's motive, including his own testimony, the Separation Notice described above that failed to mention insubordination as a reason for termination or to include Sanders' own version of events, and Central corporate documents disproving his claims of corporate downsizing, the trial court ultimately concluded:  "[G]iven the significant contradictions of Holstein's version of events, including the two months leading up to the termination, his demeanor, and his motive for not telling the truth, the Court does not find him credible and gives virtually no weight to his testimony.  Holstein's attempt to hide behind Sanders' at-will status does not shield Central in this context. Holstein's conduct was wrongful and directly caused Sanders's damage."

---

[4]  Specifically, Holstein testified his decision to terminate Sanders was triggered in part by the facts that "the terminal was heavy on staffing" and Central was "headed into a down economy," prompting "concerns about productivity."

10

Further, with respect to the trial court's actual legal analysis in rejecting Central's mixed motive and mistake defenses, we again find no error. Indeed, a close reading of Central's briefs reflects that Central, not the trial court, has misapplied the law. Specifically, Central suggests the mere existence of evidence of legitimate reason(s) for termination (in this case, Sanders' failure to report injury and Central's need to downsize) "entitled Central to immediately terminate the employment relationship." However, under correct application of the law, an employer with mixed motives for terminating an employee remains liable for wrongful discharge if the evidence establishes that the employee would *not* have been terminated based on the legitimate motive(s) in the absence of the illegitimate motive. (*Hentzel v. Singer Co., supra*, 138 Cal.App.3d at p. 298; *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1226 fn. 5 ["The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus"].) Indeed, even under Central's authority, *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, a plaintiff may prevail on a wrongful termination claim under the Fair Employment and Housing Act (FEHA) if he or she can "show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor . . . ." (*Id.* at pp. 232-233 [explaining that requiring discrimination to be a "substantial motivating factor" ensures "liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision"].)

Here, the evidence of motive, which we have already described in detail (pp. 9-10, above), is more than sufficient to draw the necessary inference that, in the absence of Sanders' protestations about the orange lift gate's safety risk, he would not have been terminated for having failed to report his earlier injury from the orange lift gate or due to Central's purported need to downsize. This evidence, particularly the corporate documents undermining Holstein's claims regarding the purported need to downsize, was also sufficient to support the trial court's decision to discount the overall weight of Holstein's testimony on credibility grounds. (*Valero v. Board of Retirement of Tulare County Employees Assn.* (2012) 205 Cal.App.4th 960, 965-966 [the trier of fact is the

11

sole judge of witness credibility, and has discretion to reject even uncontradicted testimony as not credible].)

Finally, we quickly dispose of Central's contention that the trial court misapplied the law governing *Tameny* claims by failing to make the requisite finding that Sanders' complaint about the orange lift gate related to an "actual or potential harm or danger to the public," as opposed to a harm or danger to Sanders alone. While Central correctly states the law in this regard (*Barton v. New United Motor Manufacturing, supra,* 43 Cal.App.4th at p. 1208 ["action[s] for wrongful discharge in violation of public policy must be predicated on a policy that concerns society at large rather than the individual interests of the employer or employee"]), the record belies its contention that the trial court misapplied it. Indeed, we can conceive of few, if any, cases involving a *Tameny* claim where the plaintiff's personal rights are not also implicated. As explained in *Barton v. New United Motor Manufacturing, supra*, "the gravamen of the wrongful termination action is *the violation of some personal right considered to be of fundamental public importance*, protected or guaranteed either by statute or the Constitution, not the financial or economic loss from the termination of employment." (*Id*. at p. 1209 [italics added]. See also *Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1256 fn. 10 ["[t]he interest advanced by the policy must inure to the benefit of the public at large, rather than simply to the individual employer or employee"].) And clearly the public workplace safety policies underlying Sanders' valid protestation about a dangerous piece of trucking equipment serve not just Sanders, but all Central drivers who, like Sanders, face the possibility of being assigned a trailer equipped with the orange lift gate. (See *Hentzel v. Singer Co., supra,* 138 Cal.App.3d at p. 296 ["California has long maintained a policy of protecting the right of employees to voice their dissatisfaction with working conditions"].)

Thus, in light of the trial judge's proper application of the governing legal principles, and in light of the substantial evidence supporting its ultimate findings and conclusion, the judgment against Central for wrongfully terminating Sanders must stand.

## II.     Is Sanders entitled to damages for emotional distress?

Central's remaining contention is that the trial court erred by awarding Sanders damages for his emotional distress arising out of his wrongful termination.  Central reasons that "liability for wrongful termination does not expose the employer to an award of damages for emotional distress" because "[t]he Workers' Compensation Act is the exclusive source of damages for emotional distress arising out of loss of employment." We again disagree.

Quite simply, Central's attempt to limit the scope of Sanders' damages arising from its decision to wrongfully terminate his employment under these circumstances is contrary to California law.  As the California Supreme Court has recognized, because a cause of action for wrongful discharge in violation of public policy sounds in tort rather than contract or statutory law, a prevailing plaintiff is entitled to recover the *full panoply* of compensatory and punitive damages.  (See *Tameny, supra*, 27 Cal.3d at pp. 176-177 and fn. 10 (rejecting the argument that a tort cause of action for wrongful termination in violation of public policy should not be permitted due to the availability of punitive damages in tort actions because such an award would "impair[] the employer-employee relationship"]; see also *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 893 ["[i]ndeed, mental suffering frequently constitutes the principal element of tort damages [citation]; awards which fail to compensate for pain and suffering have been held inadequate as a matter of law"].)  Central's authority in challenging the award, *Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, is not inconsistent; it is distinguishable.  (*Id*. at p. 1000 ["Under an exception to the exclusivity of workers' compensation remedies, an injured employee may bring a civil action against another employee '[w]hen the injury or death is proximately caused by the willful and unprovoked physical act of aggression of the other employee.'  (Lab. Code, § 3601, subd. (a)(1) [fn. omitted].)"].)  The same is true with respect to *Harris v. City of Santa Monica, supra,* 56 Cal.4th 203.  The *Harris* court held that, due to "the inherent difficulties in disentangling the possible sources of a plaintiff's emotional distress upon being fired, . . . a termination decision substantially motivated by discrimination is not compensable in

13

damages under section 1294(a) when an employer makes a same-decision showing" (meaning the employer shows it would have fired the employee anyway for lawful reasons). In this case, as we have already held, Central failed to make the requisite same-decision showing. (56 Cal.4th at p. 234; see pp. 11-12, *ante*.)

Given the clarity of the law in this regard and Central's failure to identify any relevant case law to the contrary, we conclude no further analysis is required. The damages award in this case stands.[5]

## DISPOSITION

The judgment is affirmed.

_____

Jenkins, J.

We concur:

_____

Pollak, Acting P. J.

_____

Siggins, J.

---

[5] In its opening brief, Central made the additional argument that the trial court's award of back pay to Sanders was erroneous. Central reasoned that Sanders was not entitled to back pay because he was disabled during the relevant period of time. (See *Davis v. Los Angeles Unified School Dist. Personnel Com.* (2007) 152 Cal.App.4th 1122, 1133-1134.) In response, Sanders noted that, as a legal matter, this argument should be deemed forfeited because Central failed to raise it before the trial court and, as a factual matter, it fails because Sanders was not disabled during the identified period of time, rather, he was assigned to light duty. In its reply brief, Central does not respond to Sanders' counterarguments and, in fact, makes no mention of its earlier back pay argument. As such, we conclude this argument has been abandoned and decline to address it further.

14